In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3583

United States of America,

Plaintiff-Appellee,

v.
Larry Barnes,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 109--Rebecca R. Pallmeyer, Judge.


Argued April 26, 2000--Decided October 13, 2000


   Before Bauer, Rovner, and Diane P. Wood, Circuit
Judges.

   Diane P. Wood, Circuit Judge.  Larry Barnes was a
real estate broker who strayed from the realm of
legitimate transactions into that of money
laundering. A grand jury returned an indictment
against him on February 17, 1999, for a single
count of attempted money laundering, in violation
of 18 U.S.C. sec. 1956(a)(3)(B), with respect to
a transaction that took place on February 18,
1994. He moved to dismiss the indictment on the
ground that the prosecutors waited too long to
bring their case, and thus that it was barred by
the five-year federal criminal statute of
limitations, 18 U.S.C. sec. 3282. The district
court found that the events of February 18, 1994,
were enough to support the case and thus rejected
his argument. After a one-day bench trial, the
court found Barnes guilty as charged; it later
sentenced him to 41 months in prison. On appeal,
he claims only that the indictment should have
been dismissed on timeliness grounds. We
disagree, and affirm the judgment of the district
court.

I
   Barnes worked as a broker for the Amaris
Mortgage Company in the Chicago area. On January
24, 1994, as part of a criminal investigation
being pursued by the Internal Revenue Service, a
confidential informant introduced Barnes to one
"A.J.," a purported drug dealer interested in

buying real estate with "unreported income." In fact, A.J. was undercover IRS Special Agent Anderson Jackson, who was wearing a recording device. The informant frankly told Barnes that A.J. wanted to use drug money and an assumed name for his property purchase; Barnes indicated that he understood and that he did not care about the source of A.J.'s money.

Once the introductions were complete at the January 24 meeting, Barnes offered A.J. an apartment building for $79,000 and a single-family home for $25,000. A.J. expressed interest, whereupon the three went to view the properties. En route, Barnes explained that, by purchasing the properties, A.J. could "wash" his money so that he could claim he had legitimate income from the real estate, and that he could later invest additional illegitimate funds with income from the properties and claim that everything was legitimate. When A.J. expressed fear about getting caught laundering money, Barnes assured him that everything was "covered." After viewing both properties, A.J. agreed to buy them.

Barnes and A.J. next met at Amaris Mortgage on February 4, 1994. There the two both discussed the mechanics of money laundering further (both generally and how Barnes planned to handle the particular transaction) and they began preparing the paperwork for A.J.'s two purchases. Later that day, they met with an attorney in Barnes's office. Barnes instructed the attorney to prepare a "$29,000 transaction," to disregard the source of the "front money," and to structure the deal so that A.J. would pay in installments at an interest rate of 8.5% with a five-year amortization period. Uncomfortable that A.J. was asking too many questions in front of the lawyer, Barnes took him away from the lawyer's presence and explained his plan further. He suggested that A.J. put $1,000 down on one of the properties and pay the balance in cash, even though the paperwork would show that the balance was to be paid in installments. A.J. then requested that the title be put in the name of "Andrew Jackson," and on that basis Barnes ordered the title commitment. Barnes then suggested that A.J. make a $50,000 down payment at a meeting scheduled to take place the following week. A.J. agreed, noting that he first had to travel to Miami to "square up something," but that he would return in a few days with the money.

Notably, everything we have described up to this point took place more than five years before the indictment was returned. Only the events of the last encounter between Barnes and A.J., which occurred on February 18, 1994, came in under the limitations wire. We therefore pay particularly

close attention to what happened on the 18th.

A.J. met with Barnes on the 18th, claiming to have $100,000 in cash from a 75-kilogram cocaine deal in Florida, and bragging that he had made $1,500 per kilogram. Ever the accommodating broker, Barnes replied that he could get rid of the money "real quick . . . through his business." Unfortunately, however, the attorney with whom the two had met on February 4 was in court. Barnes, unwilling to wait for the plum he thought he was about to get, immediately called another attorney to set up a real estate closing. The second attorney was also unavailable, but Barnes was able to leave a message with his assistant indicating that Barnes needed to set up an "emergency" closing that afternoon and asking the attorney to prepare the necessary paperwork. Barnes also told A.J. that he would adjust the paperwork to show a purchase price of $30,000 and that the remaining $70,000 would be a "payoff"; he suggested to A.J. that if the latter were ever questioned about the low selling price, he could say that the properties were causing a headache to the seller and that the seller just wanted to unload them. Barnes expected, however, the full $100,000 as the true down payment. With these matters settled, Barnes and A.J. adjourned to a local restaurant for lunch while they waited for the second attorney.

On the way to the restaurant, A.J. told Barnes that his drug source was a "cocaine farm" and that he had received the extra $50,000 "from a Colombian." Over lunch, Barnes continued to tout his ability to shift money around so that no one could trace it. He described how he had set up a series of different corporations and used their tax identification numbers in lieu of his social security number to open up four separate bank accounts. These accounts, he thought, would be a good place to store A.J.'s cash, using a series of small deposits to avoid IRS reporting requirements. He also suggested that he could help A.J. launder future drug money by helping him buy a business franchise, such as a gas station or a car dealership. When they finished their lunch, the two left the restaurant, ostensibly heading for the lawyer's office. At that point, federal agents performed a mock arrest of A.J. to extract him from the operation. The following day an IRS agent questioned Barnes, but did not arrest him.

II

Four years and 364 days later, the grand jury indicted Barnes for attempted money laundering. Barnes, who had not had contact with the government since the day after A.J.'s "arrest,"

moved to dismiss the indictment, claiming that the prosecution was barred because the charged conduct occurred on February 4, 1994. The district court deferred ruling on the motion, and then denied it after the bench trial, where the government presented evidence of Barnes's activities on each of the three critical days: January 24, February 4, and February 18, 1994. The court found that Barnes had committed all of the acts constituting elements of the attempted money laundering offense charged in the indictment on February 18, 1994; it accordingly denied the motion to dismiss and, as noted earlier, found Barnes guilty as charged.

Although we review de novo the question whether the statute of limitations has run, see United States v. Anderson, 188 F.3d 886, 888 (7th Cir. 1999), the question whether the district court properly found that there was sufficient evidence to show that Barnes committed the complete offense of attempted money laundering on February 18, 1994, is one that receives the highly deferential review reserved for evidentiary challenges to criminal convictions, see United States v. Richardson, 208 F.3d 626, 631 (7th Cir. 2000); United States v. Griffin, 150 F.3d 778, 784 (7th Cir. 1998).

Barnes sees the attempted money laundering for which he was indicted as a continuous string of actions that began on January 24 and was complete no later than February 4. Since all elements of the offense were in place by February 4, that is the latest date from which the statute of limitations could run in his view, no matter what he may have done later on February 18. He also argues that the February 18 transaction cannot be seen as a separate, stand-alone instance of attempted money laundering, because on that day Barnes never took a substantial step toward conducting a financial transaction. Last, he urges us to reject the government's alternative theory, which is that money laundering is a continuing offense for which the statute of limitations keeps running until the crime expires. See, e.g., Toussie v. United States, 397 U.S. 112 (1970).

In our view, the district court's conclusion that the February 18 events taken by themselves established that Barnes attempted unlawfully to launder money is supported by the evidence. We thus have no need to consider the question whether money laundering can fit within the narrow confines of the "continuing offense" doctrine recognized in Toussie. See also United States v. Yashar, 166 F.3d 873 (7th Cir. 1999). Nor is it material, in our view, that the government might also have sought an indictment

that focused on his activities on February 4, if it had acted with more dispatch than it showed here. A defendant has no right to choose which illegal conduct the government selects to prosecute or how that conduct is charged. Cf. United States v. Armstrong, 517 U.S. 456, 464 (1996) (as long as the prosecutor has probable cause to believe that the accused committed an offense, the decision whether or not to prosecute and what charge to present to the grand jury generally rests entirely within her discretion, subject only to constitutional constraints).

To convict Barnes of attempted money laundering, the government had to prove beyond a reasonable doubt that he attempted, with the intent to conceal or disguise the nature, location, source, ownership, or control of property he believed to be the proceeds of specified unlawful activity such as dealing in narcotics or other dangerous drugs, to conduct a financial transaction with property represented to be the proceeds of specified unlawful activity. See 18 U.S.C. sec. 1956(a)(3)(B). To prove the "attempt," the government had to show that Barnes acted with the specific intent to conduct the financial transaction described in the substantive statute, and that he took a substantial step toward completion of the transaction. See United States v. Cea, 914 F.2d 881, 887 (7th Cir. 1990); United States v. Rovetuso, 768 F.2d 809, 821 (7th Cir. 1985).

Barnes does not contest the fact that he had the specific intent to commit money laundering on February 18, but, he urges, he did not take a substantial step in furtherance of the crime on that date. No paperwork for the closing was prepared, no money actually changed hands, and no meeting with the attorney ever took place.
Even if we agreed that those facts were not established, however, we cannot conclude that the steps Barnes did take were not substantial. A substantial step is something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime. Rovetuso, 768 F.2d at 821. In determining whether a person took a substantial step in furtherance of a crime, the court should focus on the acts he took to complete the crime, not on those still to be done. Id. at 821 n.12. The act must be of such a nature that a reasonable observer viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute. Id. at 821.

In this case, Barnes took the following steps on February 18: he placed a call to an attorney for the purpose of setting up an immediate real

estate closing for the sale of the two properties in exchange for money he believed to be the proceeds of illegal narcotics sales; he instructed the attorney's assistant to set up the meeting for later that day and to see that the paperwork would be ready; and he was on his way to that meeting, with the purported buyer, at the time of his arrest. A reasonable observer could conclude that these steps were substantial and that they were undertaken in accordance with a design to violate the statute. Compare Cea, 914 F.2d at 888. It is no defense that, unbeknownst to Barnes, completion of the illegal plan was impossible. See United States v. Coffman, 94 F.3d 330, 333 (7th Cir. 1996). By placing the call to the attorney, giving the instructions, and heading for the attorney's office, Barnes demonstrated that he was prepared to complete the transaction that day and that he would have done so but for A.J.'s "arrest." In that sense, this case is like United States v. Mims, 812 F.2d 1068, 1078 (8th Cir. 1987), in which the Eighth Circuit found that the evidence was sufficient to find the defendant guilty of attempt where events had moved beyond the preparation stage and would have resulted in the completed crime but for the government's intervention.

Although the district court looked at the activities of January 24 and February 4 in coming to its conclusion, this was not improper. Relevant pre-limitations evidence is admissible to show the existence of a scheme to complete an illicit transaction. United States v. Wellman, 830 F.2d 1453, 1464 (7th Cir. 1987). Here, Barnes's pre-limitations activity was relevant to interpret the meaning of his call to the attorney to set up the emergency meeting.

III

We therefore conclude that the evidence was sufficient to prove that Barnes committed the offense of attempted money laundering, as charged in the indictment, on February 18, 1994. Because the indictment was returned on February 17, 1999, it was within the five-year limitations period established by law. The judgment of the district court is Affirmed.