PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 02-4833

JOSEPH WAYNE PRATT,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CR-02-59)

Argued: September 26, 2003

Decided: December 5, 2003

Before NIEMEYER, LUTTIG, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Luttig joined. Judge Motz joined in Parts I, II, IV, and V of the opinion and wrote a separate opinion dissenting from Part III and from the judgment.

_____

## COUNSEL

**ARGUED:** Paul Geoffrey Gill, Assistant Federal Public Defender, Richmond, Virginia, for Appellant. Sara Elizabeth Flannery, Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Frank W. Dunham, Jr., Federal Public Defender, Richmond, Virginia, for Appellant. Paul J. McNulty, United States Attorney, Richmond, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

Joseph Wayne Pratt was convicted on five drug trafficking counts: one count of conspiracy to traffic in cocaine, three counts of attempt to possess cocaine with the intent to distribute it, and one count of using a communication facility — a telephone — to facilitate one of the attempt violations. The district court sentenced Pratt to 188 months' imprisonment.

On appeal, Pratt contends (1) that the evidence was insufficient to support the convictions on the three attempt counts and that, with their dismissal, the court must also dismiss the count charging him with using a communication facility to aid in one of the attempts; (2) that his right to due process was violated when the district court permitted a government agent to enter the jury room to "cue up" an audiotape on the tape recording machine to a portion requested by the jury; (3) that the district court abused its discretion in admitting audiotape transcripts; (4) that the district court abused its discretion in refusing to grant a multiple-conspiracy instruction; (5) that the district court abused its discretion in refusing to grant an entrapment instruction; (6) that Pratt was entitled to a new trial because of the cumulative effect of various allegations of pretrial misconduct by the government; and (7) that the district court, in sentencing Pratt, erroneously enhanced his Criminal History Category by taking into account two orders of "civil contempt for failure to pay child support."

For the reasons that follow, we affirm.

I

Joseph Pratt was involved in a longtime cocaine-distribution conspiracy, beginning in the spring of 1996 and continuing to February 2002, which involved Christopher Lamont Hill, Mark Beale, Curtis Campbell, Larry Kelly, and others. Kelly was arrested, pleaded guilty in 1999 to drug conspiracy, and was sentenced to 210 months' imprisonment. After his sentence, he agreed to cooperate with a law enforcement investigation in Westmoreland County, Virginia, in exchange for a promise to have his sentence reduced.

During the period of cooperation, Kelly traveled with the co-conspirators, wearing an audio recording device by which he recorded conversations with Pratt, beginning in September 1999 and ending in the spring of 2000. Upon completion of this investigation, a grand jury indicted Pratt on counts of conspiracy, attempted trafficking on September 9, 1999, February 10, 2000, and March 30, 2000, and use of a communication facility to aid and facilitate the March 30 attempt. A jury convicted Pratt on all counts, and following sentencing, Pratt filed this appeal.

## II

Pratt's principal argument on appeal challenges the sufficiency of evidence on Counts 3, 4, 5, and 6. Counts 3 through 5, which incorporated the conspiracy allegations of Count 1, alleged additional conduct specific to September 9, 1999, February 10, 2000, and March 30, 2000, stating that on each occasion Pratt *attempted* to possess cocaine with the intent of distributing it or aiding and abetting such possession, each in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1), and 18 U.S.C. § 2. Count 6 charged Pratt with using a telephone in the commission of the March 30 attempt violation charged in Count 5, in violation of 21 U.S.C. § 843(b).

Pratt contends that the "words" that were recorded on the audiotapes and offered to prove the offenses alleged in Counts 3 through 5 constituted the only evidence to support his convictions on those counts and that they are insufficient proof of the crime of attempt. He asserts:

> There is no evidence that Pratt possessed the specified drugs or money necessary to effect the transactions discussed on those dates . . . or that he brought together someone [with] someone else who actually did have the specified drugs to sell in the same place as a prospective purchaser who actually had the money to buy. There was therefore insufficient proof of the "substantial step" required by law to support those convictions.

An attempt to commit a crime, which is recognized as a crime distinct from the crime intended by the attempt, punishes conduct that

puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance. And 21 U.S.C. § 846 specifically punishes an attempt to violate the drug trafficking laws. While the statute does not define the elements of an attempt, the crime is nonetheless well understood in the law, and its elements are not generally disputed.

To establish that a defendant committed the crime of attempt, the government must prove that (1) the defendant had the requisite intent to commit a crime; (2) the defendant undertook a direct act in a course of conduct planned to culminate in his commission of the crime; (3) the act was substantial, in that it was strongly corroborative of the defendant's criminal purpose; and (4) the act fell short of the commission of the intended crime due to intervening circumstances. *See*, *e.g.*, *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996); *United States v. Sutton*, 961 F.2d 476, 478 (4th Cir. 1992); *United States v. McFadden*, 739 F.2d 149, 152 (4th Cir. 1984) (developing Fourth Circuit's standard from § 5.01 of the Model Penal Code); Model Penal Code § 5.01(1)(c); *Clark and Marshall's Treatise on the Law of Crimes* § 4.06 (Melvin F. Wingersky ed., 6th ed. 1958). The Model Penal Code, from which this court's formulation was originally drawn, provides the following list of acts strongly corroborating a defendant's criminal purpose:

> (a)  lying in wait, searching for or following the contemplated victim of the crime;

> (b)  enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

> (c)  reconnoitering the place contemplated for the commission of the crime;

> (d)  unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

> (e)  possession of materials to be employed in the commission of a crime, that are specially designed for such

unlawful use or that can serve no lawful purpose of the actor under the circumstances;

(f)   possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, if such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g)   soliciting an innocent agent to engage in conduct constituting an element of the crime.

Model Penal Code § 5.01(2).

Mere preparation for the commission of a crime, however, does not constitute an attempt to commit a crime. But if preparation comes so near to the accomplishment of the crime that it becomes *probable* that the crime will be committed absent an outside intervening circumstance, the preparation may become an attempt. Thus the line between mere preparation and a substantial act done toward the commission of a crime is inherently fact-intensive, and it is not always a clear one. *See Neal*, 78 F.3d at 906 (citing *United States v. Coplon*, 185 F.2d 629, 633 (2d Cir. 1950) (Learned Hand, C.J.) ("The decisions are too numerous to cite, and would not help much anyway, for there is, and obviously can be, no definite line [between preparation and attempt]")). To determine whether conduct is preparation or an attempt, a court must assess how probable it would have been that the crime would have been committed — at least as perceived by the defendant — had intervening circumstances not occurred. Applying this standard, it becomes clear that the direct, substantial act toward the commission of a crime need not be the last possible act before its commission. An attempt comprises any substantial act in a progression of conduct that is meant to culminate in the commission of the crime intended.

Thus, while words and discussions would usually be considered preparations for most crimes, a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed. In *Neal*, we held that the discussion leading to an agreement to engage in crack cocaine transactions, along with corrob-

orative evidence, was a substantial step toward the commission of the drug transaction when the defendant Neal left the discussion with a final, unconditional agreement that he would obtain the crack cocaine. 78 F.3d at 906. We found it helpful to the finding in that case that when Neal was arrested, he tried to evade police, and after his arrest, police discovered drugs and paraphernalia about his mother's house. *Id.* at 907; *see also* Model Penal Code § 5.01(2)(g) (providing that a substantial step may be the "solicit[ation] [of] an innocent agent to engage in conduct constituting an element of the crime").

We believe that the factual record presented in this case is analogous to the record presented to the court in *Neal* and supports the jury's conviction of Pratt on Counts 3, 4, and 5. In this case, Pratt had over several years trafficked in cocaine as a buyer, seller, and middleman, working with multiple co-conspirators. As the indictment charged:

> The defendants [including Pratt] and their co-conspirators played different roles, took upon themselves different tasks, and participated in the affairs of the conspiracy through various criminal acts. The defendants made themselves and their services available at times throughout the conspiracy and would participate in the selected purchases and sales of cocaine hydrochloride and cocaine base, commonly known as "crack," on an as-needed basis. The defendants and their co-conspirators adopted and carried out various roles at various times during the life of the conspiracy.

The government presented evidence to support these allegations.

In the context of this conspiratorial conduct, Counts 3, 4, and 5 charged Pratt with attempts to function as a middleman in intended drug transactions on September 9, February 10, and March 30. The evidence presented by the government included both the evidence with respect to the general conspiracy and evidence supplied by audiotape recordings consisting of discussions and actions taken by Pratt on September 9, 1999, February 10, 2000, and March 30, 2000, and it tended to prove Pratt's function as a middleman in drug trafficking.

The evidence showed that on September 9, after Kelly and Pratt reached agreement that Kelly would sell cocaine that Pratt would

obtain from Lamont Hill, Kelly drove Pratt in Kelly's car to meet Mark Beale, the intended purchaser of the drugs. Pratt gave Kelly instructions, as they drove, on how to get to Beale's residence. After they arrived, Pratt introduced Beale to Kelly, and the group confirmed the price. Specifically, when Beale entered the car and joined Kelly and Pratt, Beale confirmed the agreement that he would purchase "Quarter pound. Eighth [of a kilogram] of base" at "thirty-six hundred [dollars]." Completion of the deal had to await Beale's obtaining the cash from his customer. Beale promised to get back by "tomorrow," "[t]omorrow evening, for sure." In the context of Pratt's overall conspiratorial conduct, those specific actions establish a "substantial step" directed toward the commission of a drug transaction in which Pratt intended to be the middleman, aiding or abetting the transaction. *See* 18 U.S.C. § 2; 21 U.S.C. § 841(a)(1); Model Penal Code § 5.01(3) (providing that "[a] person, who engages in conduct designed to aid another to commit a crime that would establish his complicity . . . if the crime were committed by such other person, is guilty of an attempt").

Similarly, on February 10, 2000, Pratt again performed his middleman role, presenting to Kelly an offer from Pratt's cousin to sell Kelly 62 grams of cocaine for $2,000. The evidence showed personal effort on the part of Pratt to facilitate the deal. When Kelly resisted the high price, Pratt assured him that with his seller, "He give[s] you extra every time." Pratt and Kelly eventually agreed that in the proposed transaction, Kelly would accompany Pratt to meet the seller. Thus, Pratt presented the offer to Kelly, encouraged him to accept it, and agreed to the details of the transaction. Again performing as a middleman, Pratt took steps toward the intended completion of a drug transaction to which he would have been an aider and abettor.

Finally, on March 30, 2000, Pratt again attempted to bring about a drug transaction when he called Kelly by telephone to set a final time of "two o'clock tomorrow," "exactly two o'clock now," for the transaction. By establishing the specific time for the deal to take place and passing the information on to Kelly, Pratt not only took substantial steps toward completion of the transaction but completed his function as middleman in a deal for which, had it transpired, he would again have been liable for aiding and abetting.

The incidents on September 9, February 10, and March 30 involved more than mere words or preparation. The evidence is sufficient for a rational jury to conclude that Pratt was a drug dealer who had been participating in a longtime drug conspiracy and that, during these incidents, he functioned as a middleman, intending that drug transactions take place and assisting the conspirators to complete them. There can be little doubt that, but for outside intervention, the transactions that Pratt intended would have occurred, in violation of 21 U.S.C. § 841, and that Pratt would have been an aider and abettor, in violation of 18 U.S.C. § 2. The evidence in the record is therefore sufficient to enable a rational jury to find Pratt guilty beyond a reasonable doubt of criminal attempt, in violation of 21 U.S.C. § 846.

Because the evidence was sufficient to support the convictions on Counts 3, 4, and 5, it was also sufficient to support the conviction on Count 6, charging that the attempt described in Count 5 was facilitated by a telephone, as there is no dispute that a telephone was used in the March 30 incident.

### III

Pratt next contends that his right to due process was violated when the district court directed a government agent to enter the jury room and "cue up" an audiotape on the tape recorder to a specific location requested by the jury without also providing for Pratt's presence during the process.

During deliberations, the jury sent the district judge a note stating, "We cannot find the dialogue on tape 10 B. We want to listen to line 91. Can we obtain assistance in finding this section of the tape?" The district judge directed the tape-recorder technician, a special agent of the Drug Enforcement Administration, to find the place on the tape requested by the jury, and he ordered that a court security officer accompany the technician "to watch him, and he is to have no conversation with the jury and try to influence them in any way." The technician completed the task within a few minutes, and jury deliberations resumed.

Pratt's counsel, who was in the courtroom but not in the jury room where the audiotape was cued up, objected.

Pratt now contends that ordering the technician and the court security officer to the jury room without Pratt's being present with counsel violated Federal Rule of Criminal Procedure 43. He argues that this conduct is more egregious than simply playing an entire tape for the jury because the technician here was "in effect *directing* jurors to a particular piece of tape evidence, and not merely conducting the ministerial task of playing an entire tape." Pratt notes that even playing an entire tape requires a new trial, citing *United States v. Freeman*, 634 F.2d 1267 (10th Cir. 1980), and our unpublished decision in *United States v. Jayson*, No. 93-5879, 1995 WL 234249 (4th Cir. Apr. 21, 1995).

Rule 43(a) requires that the defendant "be present at . . . every trial stage, including jury impanelment and the return of the verdict."* Cases interpreting this rule have held that playing a tape for the jury outside of the defendant's presence violates the rule. *See United States v. Brown*, 832 F.2d 128 (9th Cir. 1987); *Freeman*, 634 F.2d at 1267. A violation of Rule 43 is subject to harmless-error review, and the judgment "may stand only if there is no reasonable possibility that the practice complained of might have contributed to the conviction." *United States v. Camacho*, 955 F.2d 950, 955 (4th Cir. 1992) (citing *United States v. Hasting*, 461 U.S. 499, 506 (1983)).

There is no suggestion in this case that the district court's order was not carried out as directed by the court, and we presume therefore that it was because the court assured compliance through the presence of the court's own security officer. Under the court's order, as enforced by the court's security officer, the technician entered a jury room, cued up the audiotape to the designated spot, and exited, without conversing with the jury or remaining present during its deliberations. In these circumstances, the technician would not have overheard or affected any deliberations, nor would he have done anything other than the ministerial task of cuing up the audiotape. The technician's task might be analogized to replacing a burned out light

---

*The form of Rule 43(a) that applied at the time of trial in this case required that the defendant "be present at . . . every stage of the trial including the impaneling of the jury and the return of the verdict," but no change of meaning was effected by the 2002 amendments to this rule.

bulb in the jury room or carrying into the jury room a large exhibit that had been admitted into evidence.

The incident in this case is unlike a situation where a technician plays a tape to a jury while the jury listens to the evidence as part of its deliberations. *Cf.*, *e.g.*, *Freeman*, 634 F.2d at 1268. In such a circumstance, the technician would be present during actual deliberations, and the burden on the government to demonstrate harmlessness would be significantly greater.

The risk attendant to the practice of sending a person into the jury room to cue up an audiotape on a tape recorder is sufficiently great that we do not condone it. The jury's request undoubtedly could have been accommodated without raising a Rule 43 question. On the record before us, however, we conclude that there is no "reasonable possibility" that the technician's cuing up the tape and then leaving the jury room had any effect on the outcome of Pratt's trial. *See Camacho*, 955 F.2d at 955.

IV

The only other argument advanced by Pratt meriting some discussion is his contention that the district court erred in enhancing his Criminal History Category during sentencing by taking into account what Pratt characterizes as "two civil non-support proceedings" in which Pratt was found in contempt and ordered to serve time in prison. He argues that because the sentences were for "civil contempt," they should not be included as part of Pratt's "prior criminal behavior." U.S.S.G. chap. 4, pt. A, introductory cmt. (2002).

Section 4A1.1 of the Sentencing Guidelines, which specifies how a defendant's prior criminal history is used to determine the defendant's Criminal History Category, provides that two criminal history points are to be added for each "prior sentence of imprisonment of at least sixty days," U.S.S.G. § 4A1.1(b), and sentences of imprisonment for "contempt of court" and "non-support" qualify as such prior sentences, provided they are for "at least thirty days," *id.* § 4A1.2(c)(1).

In this case, the record shows that Pratt appeared before State court on November 12, 1998, in response to a show cause order for his fail-

ure to pay child support. The court then established that Pratt had accumulated an arrearage in child support payments and ordered him to begin making supplemental support payments to reduce the arrearage. Two months later, when Pratt had failed to comply with the court's order, the court "sentenced the defendant to serve six months in jail."

A few months after Pratt was released from jail, he again accumulated a significant arrearage in nonsupport payments. On August 25, 1999, the State court "ordered the defendant to serve 6 months in jail," but it also ordered that the sentence could be purged "if the defendant paid $1,500 to the petitioner." Pratt appealed that order but did not post the required bond and the case was remanded to the domestic relations court. At the September 27, 1999 disposition hearing that followed, Pratt did not appear, and the court issued a warrant to the sheriff to arrest Pratt "for service of the 6-month jail sentence." Pratt was never apprehended, and the record shows that he "remain[ed] on an 'escape status.'"

Thus, the record reveals that Pratt was punished twice by a six-month sentence *for a definite period* with no mention of any opportunity to purge the sentence. While the second order *initially* entitled Pratt to purge the sentence, it was converted into a definite six-month jail sentence when Pratt failed to appear.

While Pratt argues that these sentences were for "civil contempt," the record belies his claim, indicating that they were six-month sentences entered for punishment and therefore were criminal contempt sentences. The distinction between a sentence for civil contempt and a sentence for criminal attempt is well established. A civil contempt sentence aims to "coerce the defendant to do the thing required," whereas a sentence for criminal contempt "operates . . . solely as punishment for the completed act of disobedience." *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442-43 (1911); *accord Hicks v. Feiock*, 485 U.S. 624, 631-33 (1988); *Carbon Fuel Co. v. United Mine Workers*, 517 F.2d 1348, 1349 (4th Cir. 1975). In *Hicks*, the Supreme Court articulated the test for making the distinction: "[I]t is remedial if 'the defendant stands committed unless and until he performs the affirmative act required by the court's order,' and is puni-

tive if 'the sentence is limited to imprisonment for a definite period.'" *Hicks*, 485 U.S. at 632 (quoting *Gompers*, 221 U.S. at 442).

It is readily apparent that both six-month sentences imposed on Pratt for failing to comply with court orders were "for a definite period" and could not be purged by any affirmative act. The district court did not err in considering Pratt's two six-month sentences for criminal contempt in determining his Criminal History Category.

V

Pratt's other arguments do not merit extensive discussion. First, he objects to the government's use at trial of transcripts of taped conversations, but he has not demonstrated that the transcripts were in material variance with the audiotapes introduced into evidence. Moreover, the district court gave the jury an instruction that in the event of a variance between tapes and transcripts, the tapes controlled, thus protecting against any potential prejudice if a variance did exist. *See United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir. 1984).

Pratt also contends that the district court abused its discretion in refusing to grant his requests for instructions on multiple conspiracies and entrapment. But he has failed to point to evidence that justified his requests. With respect to whether multiple conspiracies were shown, the evidence indicates that the three defendants had extensive drug-related ties to one another and that they had the same objectives, methods, and products in the same geographical area, thus participating in a single conspiracy. *See United States v. Crockett*, 813 F.2d 1310, 1316-17 (4th Cir. 1987). And with respect to entrapment, Pratt failed to show that the government's use of Kelly as an informant induced him to commit a crime that he was previously indisposed to do. *See United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir. 1970).

Pointing to what he contends were an array of delays, peculiar strategies, discovery failures, and other pretrial conduct by the government, Pratt argues that the "cumulative effect" of the government's activities amounted to vindictive prosecution. We have considered each of Pratt's contentions and also taken them in the aggregate, yet we find that his contentions fall substantially short of what is required

to carry his burden. *See United States v. Williams*, 47 F.3d 658, 662-65 (4th Cir. 1995).

## VI

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Without the consent or presence of Pratt or his counsel, the district court facilitated a government agent's access to the jury during its deliberations. The Government has utterly failed to demonstrate that this conceded error is harmless. Thus, I must respectfully dissent.

Unquestionably, the district court erred in directing an important government witness, unaccompanied by any defense representative, to enter the jury room absent the defendant's consent to this procedure. The majority implicitly acknowledges this; the Government expressly does so. Thus, the only question before us is whether this error is harmless.

Because Pratt's counsel objected at trial to this procedure, it is the Government's burden to prove harmlessness beyond a reasonable doubt. Fed. R. Crim. P. 52(a). That is, the Government must prove beyond a reasonable doubt that the jury would have returned guilty verdicts absent this error. *See United States v. Camacho*, 955 F.2d 950, 955 (4th Cir. 1992). Accordingly, the "judgment may stand only" if the Government demonstrates that "there is no reasonable possibility that the practice complained of might have contributed to the conviction[s]." *Id.* I submit that any fair reading of the record in this case can yield only one conclusion: the Government has failed to carry this burden.

The record in this case contains only these facts:

(1)   in response to the jury's request for assistance with the tape, the district court asked the prosecutor if *she* "ha[d] a technician," and the prosecutor responded "[r]ight here";

(2)    the district court then ordered someone named Dallas to "go back" with that "technician" to the jury room and "watch him and he is to have no conversation with the jury and try to influence them in anyway"; and

(3)    after a recess of an unspecified length, the jury returned with an unrelated question.

J.A. 300-01. Critically, the record does *not* reveal: how long the "technician," a Drug Enforcement Administration agent who served as the Government's designated representative and expert witness at Pratt's trial, was in the jury room *or* whether the agent listened to portions of the tape with the jurors in the jury room *or* whether the agent ever talked, signaled, smiled, nodded, etc., to the jurors during this *ex parte* process.[1]

Indeed, the record in this case is so bereft of evidence supporting the Government's position that, first the Government in its brief, and now the majority in its opinion, have had to *create* facts. Thus, without *any* support in the record, the Government asserts:

(1)    "[i]mmediately after locating the spot on the audio tape, the agent left the jury room before the tape was played," Br. of Appellee at 25; *see also id.* at 18;

(2)    "[t]here was no discussion by jurors or the agent while they were in the room," *id.* at 18; and

(3)    the district court ordered that the recording was not "to be played for the jury's hearing while the agent was in the room." *Id.* at 26.

---

[1]The record does not even disclose the identity of Dallas or the technician. Pratt, however, has waived any objection on this ground by acknowledging in his appellate brief that Dallas was a court security officer and the technician was the Government's designated representative, DEA Agent Richard Youngbood, who testified as a government expert at Pratt's trial.

The majority adopts, *as fact*, these assertions, stating "[u]nder the court's order, as enforced by the court's security officer, the technician entered a jury room, cued up the audiotape to the designated spot, and exited, without conversing with the jury or remaining present during its deliberations." See *ante* at 9. Indeed, the majority goes a step beyond adopting the Government's nonfacts and invents one of its own, asserting that the court security officer "enforced" the district court's order. *Ante* at 9. Again, no record evidence supports any of these assertions.

The majority compounds its erroneous reliance on nonfacts by determining that it can "presume" that "the district court's order was . . . carried out" because purportedly "[t]here is no suggestion" that it was not. *Id.* Yet, by contending that the conceded error here "compels reversal," Br. of Appellant at 28, Pratt *does* "suggest" that "the district court's order was not carried out." True, in so arguing, Pratt offers no evidence of prejudice but, of course, it is not *his* burden to do so. In "presuming" Pratt suffered no prejudice, the majority improperly transfers the Government's burden of proof to Pratt. Thus, the majority requires Pratt to prove prejudice, rather than requiring the Government to prove no prejudice.

The majority must improperly shift the burden of proof in this manner to reach its result because the Government did not even *attempt* to meet its burden. Faced with defense counsel's objection to an error that may have caused "[a]ny number of prejudicial events [to] have taken place" in the jury room, *United States v. Brown*, 832 F.2d 128, 130 (9th Cir. 1987), the Government did nothing. It did not request the district court to conduct a hearing to determine whether Pratt had been prejudiced by the Government agent's contact with the jury, or make any other attempt to establish a record as to what transpired when the agent entered the jury room. The Government did not even offer an affidavit or declaration from its agent to substantiate its position that his presence, without any defense representative, caused Pratt no prejudice.

To be sure, such measures might have been insufficient to prove, beyond a reasonable doubt, that the presence of the Government agent in the jury room did not prejudice Pratt. Other courts have so held in similar circumstances. *See Brown*, 832 F.2d at 130 (holding declara-

tion of agent "fails to convince us beyond a reasonable doubt that no prejudicial contact occurred"); *United States v. Pittman*, 449 F.2d 1284, 1285 (9th Cir. 1971) (holding trial court's *post hoc* hearing "to determine whether appellants had been prejudiced by the Government agent's presence in the jury room" insufficient to demonstrate harmlessness). But in those cases the Government offered at least *some* evidence to support its contention that the error was harmless. Here the Government offers none.

In sum, the majority can hold the insidious error in this case harmless only by extensively relying on "facts" that lack any evidentiary support in the record, by "presum[ing]" Pratt suffered no prejudice, and by relieving the Government of its burden of proof.[2] Because the Government has offered no evidence, let alone proof beyond a reasonable doubt, that "there is no reasonable possibility" that the conceded error "might have contributed to" Pratt's convictions, we should vacate those convictions, as we did in *Camacho*, 955 F.2d at 955.

---

[2]My colleagues' cavalier treatment of the conceded error in this case (at one point they analogize the error to a technician screwing in a light bulb, *ante* at 9-10) may stem from a view that the improper *ex parte* presence in the jury room of a Government agent does not give rise to significant risk of prejudice and will never, therefore, be ground for reversal absent proof *by the defendant* of *actual* prejudice. Such an approach not only disregards Fed. R. Crim. P. 52(a), it also ignores the potent risk inherent in "permitting a Government agent," particularly one who has played an important role in the criminal trial, "to invade the sanctity of the jury room." *Pittman*, 449 F.2d at 1285; *see also Frank v. Mangum*, 237 U.S. 309, 349 (1915) (Holmes, J., dissenting) (noting the likelihood of jurors "to be impregnated" by outside influences). My colleagues forget that even a slight improper jury contact may prejudice a defendant, and that "[s]uch contact could be very subtle, such as a nod at a significant portion of the tape" that was "unintended or even unnoticed by the case agent himself." *Brown*, 832 F.2d at 130. Their failure to recognize this is particularly troubling here given the weakness of the Government's case, i.e., the jury could not reach a verdict as to Pratt's codefendant and the evidence offered to sustain Pratt's attempt convictions barely suffices.