# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 08-2679

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SAUL ALEJANDER SANCHEZ,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 CR 786—**John W. Darrah**, *Judge.*

ARGUED MAY 12, 2009—DECIDED AUGUST 11, 2010

Before KANNE and SYKES, *Circuit Judges*, and
VAN BOKKELEN, *District Judge.*[1]

SYKES, *Circuit Judge.* Saul Sanchez was convicted of
conspiracy and attempted kidnapping in violation of
18 U.S.C. § 1201(a)(1), (c), and (d), and conspiracy

---

[1] The Honorable Joseph S. Van Bokkelen of the United States
District Court for the Northern District of Indiana, sitting by
designation.

to retaliate against a witness in violation of 18 U.S.C. § 1513(e) and (f). The convictions arose out of a plot to kidnap Ignacio Vega and Maria Jimenez, who were witnesses in a trial against a Chicago-based drug kingpin. On appeal Sanchez argues that the district court erroneously admitted substantial evidence about the underlying uncharged drug conspiracy. He also contends that the evidence was insufficient to sustain any of his three convictions. Finally, Sanchez challenges his sentence.

We affirm in part and reverse in part. The district court did not abuse its discretion in admitting evidence regarding the underlying uncharged drug-trafficking conspiracy; this evidence was highly probative of Sanchez's motive for orchestrating the kidnapping. We also conclude that the evidence is sufficient to sustain Sanchez's convictions for conspiracy to kidnap and attempted kidnapping. But the same cannot be said of his conviction for conspiracy to retaliate against a witness. The government presented no evidence, circumstantial or otherwise, that Sanchez knew the two targets of the kidnapping plot had given testimony against the drug trafficker for whom Sanchez was purportedly working; the evidence suggested instead that Sanchez thought the targets owed the drug kingpin money. Accordingly, we vacate Sanchez's conviction on the retaliation count and remand for resentencing. As an independent ground for resentencing, the district judge erroneously withheld a three-level reduction under U.S.S.G. § 2X1.1(b)(1) because he mistakenly concluded that Sanchez was "about to complete" the kidnapping.

## I. Background

Luis Vasquez was the ringleader of a Chicago-based drug-trafficking cell and in 2004 became the subject of a law-enforcement investigation when federal agents learned that Jose Jimenez had ordered several kilograms of cocaine from Vasquez on credit.[2] Agents seized the cocaine from a stash house Jimenez used and made it appear as though Jimenez had been the victim of the burglary. When Vasquez demanded payment for the lost cocaine, Jose Jimenez approached his cousin Maria Jimenez and her husband Ignacio Vega for help. The couple owned two Chicago restaurants named "Yolanda's," and they agreed to transfer one of the restaurants to Vasquez as partial payment for Jose's debt. The transfer never occurred. Vasquez was arrested, and both Vega and Maria Jimenez testified against Vasquez at his November 2005 trial for drug trafficking, money laundering, and other related offenses.

Almost a year later, on October 10, 2006, Saul Sanchez and a coconspirator approached a confidential informant named Francisco Jimenez and asked for assistance in kidnapping two individuals and taking them to Mexico. Sanchez identified the kidnapping targets as "Jimenez" and someone named "Yolanda" who owned a restaurant at 31st Street and Lawndale Avenue in Chi-

---

[2] The background of this case is complicated by the fact that several of the key players share the surname "Jimenez." This requires that we occasionally use their given names to distinguish between them.

cago. Sanchez was actually referring to Ignacio Vega and Maria Jimenez, who owned the Yolanda's restaurants, one of which was located just blocks from the intersection Sanchez had identified. Sanchez explained to Francisco that he was kidnapping the two individuals on Vasquez's behalf because he believed that they owed Vasquez money. Sanchez asked Francisco for $25,000 to finance the kidnapping. When Francisco said he did not have that much money, Sanchez dialed back his request and asked for help in securing a minivan and a safehouse to use in the kidnapping.

Francisco Jimenez agreed to help Sanchez but instead contacted federal agents and offered to assist them in interrupting the kidnapping plot. The agents secured wiretap authority and recorded many of Sanchez's conversations, including several in which he discussed his progress in bringing the kidnapping plot to fruition. The wiretap authorization also permitted the FBI to track the cellular towers on which Sanchez's phone calls were hitting. During the ensuing several weeks, Sanchez's call history revealed that his phone was hitting on cell towers located in Laredo, Texas—on the Mexican border—and cell towers elsewhere in Texas, Oklahoma, and southern Illinois. Based on these phone calls, federal agents decided the time had come to arrest Sanchez. They arranged for a minivan to be placed in a garage at an undercover house in Burbank, Illinois, outside of Chicago. Francisco Jimenez called Sanchez to tell him he had secured a van fitting his specifications.

Sanchez and his coconspirator made arrangements to inspect the van. They met Francisco Jimenez at a prear-

ranged location in Chicago and proceeded from there to the Burbank garage where the FBI had placed the van. Surveillance continued, and Sanchez inspected the van and confirmed that it met his needs. He then discussed various details of the kidnapping plot. He told Francisco that he had located a horse ranch in Joliet, Illinois, where he planned to take the kidnapping victims before continuing on to the Mexican border, at which point he would turn them over to members of a drug cartel who would take them to Sinaloa, Mexico. But Sanchez said he could not take the van with him that day because it did not have any license plates. He said he would need about a week to secure usable plates. As Sanchez and the coconspirator left the garage, the FBI moved in and made the arrest.

Sanchez was indicted on three counts: (1) conspiracy to kidnap, 18 U.S.C. § 1201(a)(1), (c); (2) attempted kidnapping, 18 U.S.C. § 1201(a), (d); and (3) conspiracy to retaliate against a witness in violation of 18 U.S.C. § 1513(e) and (f). Sanchez was convicted by a jury on all three counts, and the district court sentenced him to concurrent terms of 218 months in prison on the first and second counts and 120 months on the third count.

## II. Discussion

Sanchez raises multiple challenges to his convictions and sentence, which we can group into three categories. First, he maintains that the district court should not have allowed the government to introduce evidence of Vasquez's drug activities or at least should have limited

the quantity of this evidence under Rule 403 of the Federal Rules of Evidence. Second, Sanchez challenges the sufficiency of the evidence to support each of his three convictions. Finally, he attacks his sentence, arguing that he was entitled to a three-level reduction under U.S.S.G. § 2X1.1.

## A.  Evidence of Underlying Uncharged Drug Trafficking

Sanchez argues that the government should not have been permitted to introduce evidence of the underlying uncharged drug-trafficking conspiracy led by Vasquez. Evidentiary rulings are usually reviewed for abuse of discretion. *See United States v. McCulley*, 178 F.3d 872, 875 (7th Cir. 1999). But because Sanchez did not object to the admission of this evidence, our review is for plain error. Accordingly, he must establish that the admission of this evidence was an error that implicated his substantial rights and "'seriously affect[ed] the fairness, integrity, or public reputation'" of the trial. *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008) (quoting *United States v. James*, 464 F.3d 699, 709 (7th Cir. 2006)).

Sanchez argues first that because the district court did not treat the underlying drug- trafficking activity as "relevant conduct" for purposes of calculating his sentencing-guidelines range, the drug-conspiracy evidence should likewise be considered irrelevant under Rules 401 and 402 of the Federal Rules of Evidence. This argument makes little sense. "Relevant conduct" is a sentencing-guidelines concept and generally refers to conduct so intimately related to the charged conduct that the sentencing court

may consider it along with the charged offense in calculating the appropriate guidelines range. *See* U.S.S.G. § 1B1.1-3. This usually requires a finding that the uncharged conduct was either part of a common scheme or occurred in preparation of or during the charged crime. *See id.* § 1B1.3. The burden is on the government to show that the evidence adduced at trial makes it *more probable than not* that the charged and uncharged conduct are sufficiently related for sentencing purposes. *See, e.g.,* *United States v. Womack*, 496 F.3d 791, 797 (7th Cir. 2007).

The standard of relevancy for admission of evidence at trial is, of course, much broader; it asks only whether the evidence sought to be admitted has *any* tendency to make a fact of consequence any more or less probable. *See* FED. R. EVID. 401. This standard was easily satisfied here. The evidence of the underlying drug conspiracy provided key factual background for the charged crimes and was unquestionably probative of Sanchez's motive for kidnapping. It established the rationale for Sanchez's plot by linking Vasquez to the kidnapping victims, explaining their prior agreement to transfer a "Yolanda's" restaurant to Vasquez as payment for a drug debt owed by the cousin of one of the victims. Without this evidence the jury would not have understood why Sanchez targeted the two.

Sanchez next argues that the evidence should have been excluded under Rule 403, which permits the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." There was no error here. To be sure, the record reveals that a significant part of the government's case involved evidence related to the underlying uncharged drug conspiracy. But as we have explained, this evidence was critical to put Sanchez's kidnapping plot in context. Moreover, the district court took care to reduce any risk of undue prejudice. The judge repeatedly restricted the scope of the government's inquiry and issued two limiting instructions advising the jury that the evidence was relevant only as background and for the purpose of showing Sanchez's motive. And the judge reinstructed the jury on this point at the close of evidence. *See United States v. Strong*, 485 F.3d 985, 991 (7th Cir. 2007) (assuming, absent indication to the contrary, that the jury followed the court's limiting instruction).

## B. Sufficiency of the Evidence

We turn now to the heart of Sanchez's appeal—whether sufficient evidence supports each of his three convictions. We review the evidence "'in the light most favorable to the government and ask whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.'" *United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000) (quoting *United States v. Rogers*, 89 F.3d 1326, 1334 (7th Cir. 1996)). A conviction will be overturned "only when the record contains no evidence, regardless of how it is weighed, upon which a rational trier of fact could find guilt

beyond a reasonable doubt." *United States v. Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002).

### 1. Conspiracy to Kidnap

To obtain a conviction for conspiracy, the government was required to prove that Sanchez: (1) agreed to commit an illegal act; (2) committed an overt act in furtherance of that agreement; and (3) had "an intent to commit the substantive offense," in this case kidnapping. *United States v. Cueto*, 151 F.3d 620, 635 (7th Cir. 1998). As applicable here, the kidnapping statute punishes "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person," and the person so kidnapped is "wilfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1).

Sanchez argues that the evidence was not sufficient for a jury to find that he intended to kidnap Vega and Maria Jimenez. We disagree. The government presented ample evidence of Sanchez's intent. Francisco Jimenez testified that at a face-to-face meeting with Sanchez on October 10, 2006, Sanchez explained that he planned to kidnap two people who owed Vasquez money. Francisco told the jury that Sanchez said he was going to take the kidnapping victims to Mexico and claimed to be acting with Vasquez's consent. Sanchez said he would need money, a safehouse, and an automobile to accomplish the kidnapping, and asked for Francisco's help. He identified the intended kidnapping targets

as "Yolanda," who owned a restaurant at 31st and Lawndale, and someone with the last name "Jimenez."

After this initial meeting, Francisco Jimenez spoke with Sanchez on several occasions about the kidnapping, and recordings of these conversations were played for the jury at trial. The two spoke on the telephone a day after the initial meeting, at which time Sanchez again discussed his plans for the kidnapping and told Francisco that he needed a van "that will allow me to head down there with the person." Sanchez called Francisco again about a week later. Although Sanchez used coded language, Francisco testified that Sanchez was discussing the arrangements for the kidnapping that he had just made on a trip to Mexico. More specifically, Sanchez said the Mexican drug cartel had agreed to assist once Sanchez brought the victims to the intended drop-off point at the border. Sanchez repeated his initial request that Francisco help him find a safehouse and a van to use in the kidnapping. A few days later Sanchez said he no longer needed help in securing a safehouse because he had located a ranch in Joliet for that purpose. The two further discussed the specifications for the van, agreeing that it should have tinted windows and new license plates.

The recording of the last meeting between Sanchez and Francisco Jimenez completed the picture for the jury. Sanchez inspected the van and said it was "more or less" what he needed but that it would take about a week to secure license plates. Asked about how many people would be traveling in the van, Sanchez initially said

"two" and then clarified, "[t]wo and two of us that might be going." He then explained that he might need more people to help with the "pick up . . . who will get into the car with the guys." Sanchez also described in some detail the ranch in Joliet that he had secured as a temporary safehouse for the victims. He then explained how he would take "them" to the Mexican border where members of the drug cartel would be waiting to take "them" to Sinaloa, Mexico.

That Sanchez referred to the victims as "Jimenez" and "Yolanda" does not undermine the government's case, as Sanchez contends. First, one of the kidnapping targets was in fact named "Jimenez," and although neither went by the name "Yolanda," they were a married couple who owned two restaurants called "Yolanda's." Second, although neither of the "Yolanda's" restaurants was located at 31st and Lawndale, one was located approximately two blocks from that address. Finally, the background evidence regarding the underlying drug-trafficking conspiracy and the payment of Jose Jimenez's drug debt to Vasquez convincingly tied Vasquez to Maria Jimenez (Jose's cousin) and her husband Ignacio Vega; their ownership of restaurants named "Yolanda's" made it clear that Sanchez understood who the targets of the kidnapping were.

Sanchez argues in the alternative that most of the taped conversations introduced at trial related to the drug-trafficking activity of the Vasquez organization and that the evidence is really more consistent with a drug-smuggling conspiracy, not a conspiracy to kidnap. This

is an attempt to invoke the principle that reversal is required whenever evidence " 'gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' " and as such " 'a reasonable jury must necessarily entertain a reasonable doubt.' " *United States v. Ramos-Garcia*, 184 F.3d 463, 465 (5th Cir. 1999) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). This is not remotely a case in which the evidence is in equipoise. Although there was significant background evidence of drug trafficking, Sanchez's recorded conversations during October 2006 are sufficient to establish the kidnapping conspiracy. Though he often used coded language, Sanchez's intent to kidnap is clear from the detailed descriptions of the minivan he needed, the safehouse he secured, and the plans that were in place to deliver the victims to the waiting members of the Mexican drug cartel on the border.

### 2. Attempted Kidnapping

Sanchez also challenges the sufficiency of the evidence supporting his conviction for attempted kidnapping. To obtain a conviction for an attempt crime, the government must prove that the defendant "intend[ed] the completed crime and t[ook] a 'substantial step' toward its completion." *United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (citing *Braxton v. United States*, 500 U.S. 344, 349 (1991)). Sanchez claims the evidence is insufficient on both elements, but we have already explained why the evidence was sufficient to establish that Sanchez intended to kidnap Vega and Jimenez. The remaining

question is whether the government proved that Sanchez took a substantial step toward completing this crime.

A substantial step is "'some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of the particular crime.'" *Id.* (quoting *United States v. Manley*, 632 F.2d 978, 988 (2d Cir. 1980)); *see also United States v. Rovetuso*, 768 F.2d 809, 821 (7th Cir. 1985) (noting that a substantial step is an overt act "strongly corroborative of the firmness of the defendant's criminal intent" (quotation marks omitted)). It is "something more than mere preparation, but less than the last act necessary before the actual commission of the substantive crime." *United States v. Barnes*, 230 F.3d 311, 315 (7th Cir. 2000). The line between mere preparation and a substantial step is inherently fact specific; conduct that would appear to be mere preparation in one case might qualify as a substantial step in another. *See United States v. Magana*, 118 F.3d 1173, 1199 (7th Cir. 1997).

Although there is no easy way to separate mere preparation from a substantial step, we are guided by two general principles. First, a substantial step must be "something that makes it reasonably clear that had [the defendant] not been interrupted or made a mistake . . . [he] would have completed the crime." *Gladish*, 536 F.3d at 648; *see also United States v. Pratt*, 351 F.3d 131, 136 (4th Cir. 2003) ("To determine whether conduct is preparation or an attempt, a court must assess how probable it would have been that the crime would have been committed—at least as perceived by the defen-

dant—had intervening circumstances not occurred.");
*Barnes*, 230 F.3d at 315 (noting that a substantial step
occurs "where events ha[ve] moved beyond the prepara-
tion stage and would have resulted in the completed
crime but for the government's intervention"). Second,
we have said that the focus is on the actions already
taken to complete the underlying crime, *not* on the acts
that remain uncompleted at the time of the arrest. *See
Barnes*, 230 F.3d at 315.

The evidence of Sanchez's conspiratorial conduct in
this case was strongly corroborative of his firmness to
carry out the kidnapping plot. He explained in rec-
orded conversations that he had secured a safehouse
in Joliet and arranged for the cooperation of the
Mexican drug cartel—indeed, he had traveled to
Mexico and back in furtherance of this aspect of the plot.
In Sanchez's final meeting with Francisco Jimenez, he
approved the van as meeting his specifications for use
in the kidnapping and offered a detailed description of
additional logistics of the scheme. This is sufficient evi-
dence for the jury to infer that the kidnapping plot had
progressed well beyond the planning stage. To be sure, the
kidnapping was not imminent at the moment Sanchez
was arrested; he said he would need a week to secure
license plates for the van. But it is clear that Sanchez
was fully committed and well along the way to putting
the kidnapping in motion.

Sanchez insists nonetheless that he has been con-
victed of a thought crime—that the taped conversations
reveal only "mental preparations" from which the jury

could infer at most that he was "all talk and no more." We have said that "[t]reating speech . . . as the 'substantial step' would abolish any requirement of a substantial step." *Gladish*, 536 F.3d at 650. The Fourth Circuit has also expressed a similar view: "[W]ords and discussions would usually be considered preparations for most crimes." *Pratt*, 351 F.3d at 136. But the government's case here went well beyond "words and discussions" and included evidence of concrete actions Sanchez took toward the completion of the kidnapping—including securing the safehouse and traveling to Mexico to enlist the assistance of the drug cartel. Viewed in the light most favorable to the government, this evidence was sufficient to sustain Sanchez's conviction for attempted kidnapping.

### 3. Conspiracy to Retaliate Against a Witness

Sanchez also challenges the sufficiency of the evidence to support his conviction for conspiracy to retaliate against a witness. The retaliation statute makes it a crime to "knowingly, with the intent to retaliate, take[] any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense." 18 U.S.C. § 1513(e). Sanchez argues that there was no evidence to permit the jury to infer beyond a reasonable doubt that he plotted to kidnap Ignacio Vega and Maria Jimenez in retaliation for their testimony against Vasquez at his trial. We agree. There is no record evidence from which the jury could infer that

Sanchez even *knew* that Vega and Maria Jimenez had testified against Vasquez, let alone that the motive for the kidnapping was to retaliate against them for that testimony. Rather, the evidence strongly supports the inference that Sanchez targeted the kidnapping victims because he believed they owed Vasquez money.

The government responds that the jury could have inferred that Sanchez learned about Vega's and Maria Jimenez's testimony from Vasquez himself or from someone associated with the Mexican drug cartel. But no evidence supports either inference; this argument relies entirely on speculation. *See United States v. Robinson*, 161 F.3d 463, 472 (7th Cir. 1998) ("'[W]e recognize that in reviewing a guilty verdict based on circumstantial evidence, we must insure that the verdict does not rest solely on the piling of inference upon inference . . . .'" (quoting *United States v. Moore*, 115 F.3d 1348, 1364 (7th Cir. 1997))). The inference might be sustainable had the government offered evidence to show that the victims' testimony at Vasquez's trial was widely publicized and that Sanchez was so closely tied to the underlying conspiracy that he might reasonably be presumed to have knowledge of that trial. *See, e.g., United States v. Johnson*, 903 F.2d 1084, 1087-89 (7th Cir. 1990). But there was no such evidence in this case. The evidence established instead that Sanchez thought his targets owed Vasquez money and that *that* was the reason for the kidnapping. Accordingly, we vacate Sanchez's conviction for conspiracy to retaliate against a witness.

## C. Sentencing

Resentencing is in order based on our decision to vacate the retaliation count. The government argues that the sentence can be affirmed even if the retaliation count is vacated because the sentence on that count was much shorter than the other two (120 months, as compared to the 218-month terms imposed on the kidnapping counts) and because the prison terms are concurrent. We disagree. The advisory sentencing-guidelines range for the conspiracy to kidnap and attempted kidnapping counts was 188 to 235 months, and 218 months falls near the high end of that range. We cannot know how the district judge might have fashioned the total sentence in this case had the retaliation count not been part of the package. *See United States v. Colon*, 549 F.3d 565, 572 (7th Cir. 2008) ("[T]he district judge sentenced [the defendant] very near the top of the applicable guideline range, and in doing so may have been influenced by the fact that the jury had found the defendant guilty of conspiracy and aiding and abetting as well as of possession.").

There is another reason Sanchez is entitled to resentencing. The attempt guideline, U.S.S.G. § 2X1.1(b)(1), provides:

> If an attempt, decrease [the defendant's base offense level] by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense *or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.*

(Emphasis added.) The judge declined to apply this three-level downward adjustment because he concluded that Sanchez was "about to complete" all the acts "necessary for successful completion of" the kidnapping. Sanchez contends that even if his actions satisfied the "substantial step" requirement for the crime of attempted kidnapping, they did not establish that he was "about to complete" the crime for purposes of denying the three-level adjustment under the attempt guideline.

Neither § 2X1.1 nor its commentary offer much guidance for determining when a defendant is "about to complete" the acts necessary to commit the substantive offense. The commentary states only that "[s]ometimes . . . the arrest occurs well before the defendant . . . has completed the acts necessary for the substantive offense. Under such circumstances, a reduction of 3 levels is provided under § 2X1.1(b)(1) or (2)." U.S.S.G. § 2X1.1 cmt. background. Other circuits have identified several factors that may inform the district court's decision to grant or deny the sentencing-guidelines adjustment for an attempt. These include the quality (as opposed to quantity) of the uncompleted necessary acts, the degree to which the defendant was prepared to complete the necessary remaining acts, and the imminence of completion of the substantive offense at the time of the arrest. *See United States v. Waskom*, 179 F.3d 303, 308-09 (5th Cir. 1999) (collecting cases). These factors suggest that the focus of the inquiry is on whether the defendant was "on the verge" of completing the substantive crime.

Here, although the evidence is sufficient to sustain the attempt conviction, it does not support the district

court's conclusion that Sanchez was about to complete the kidnapping. At the time of his arrest, Sanchez was still a week away from securing license plates for the van, and the van was essentially unusable without plates. The government suggests that it would have been easy for Sanchez to obtain license plates and because that was all that remained to be done before he actually put the kidnapping in motion, the district court properly denied the 3-level adjustment. *See United States v. Brown*, 74 F.3d 891, 893 (8th Cir. 1996) (affirming denial of reduction where the only step remaining to possess an incendiary device was to procure "easily obtainable" items such as wire and an ordinary spark plug). But there is nothing in the record to support the factual premise of the government's argument, and it is hardly self-evident that finding license plates for an apparently stolen vehicle is easy to do.

The government's argument blurs the line between the "substantial step" necessary for an attempt conviction and the § 2X1.1 inquiry, which asks whether the defendant was "about to complete" the crime. We conclude that the district court erred in withholding the 3-level downward adjustment for attempt under § 2X1.1.

For the foregoing reasons, we AFFIRM Sanchez's convictions for conspiracy to kidnap and attempted kidnapping; we REVERSE Sanchez's conviction for conspiracy to retaliate against a witness; and we VACATE Sanchez's sentences and REMAND for resentencing consistent with this opinion.