**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Wayne CARDWELL,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Leo Hinson, Defendant–Appellant.**

**Nos. 03–4585, 03–4835.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 19, 2005.

Decided Dec. 30, 2005.

---

**ARGUED:** Craig Weston Sampson, Richmond, Virginia; Randy Virlin Cargill, Magee, Foster, Goldstein & Sayers, P.C., Roanoke, Virginia, for Appellants. Thomas Ernest Booth, United States Department of Justice, Washington, D.C., for Appellee. **ON BRIEF:** Thomas K. Maher, Chapel Hill, North Carolina, for Appellant Leo Hinson. John L. Brownlee, United States Attorney, Donald R. Wolthuis, Assistant United States Attorney, Office of the United States Attorney, Roanoke, Virginia, for Appellee.

Before WILLIAMS and MICHAEL, Circuit Judges, and JAMES C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed in part; vacated and remanded in part by published opinion. Judge WILLIAMS wrote the opinion, in which Judge MICHAEL and Judge DEVER joined.

## OPINION

WILLIAMS, Circuit Judge.

Leo Hinson and John Cardwell were convicted on various murder-for-hire charges. In addition, Hinson was convicted on a felon-in-possession charge, which was tried at the same time as the other counts. Hinson and Cardwell were each sentenced based, in part, on facts found by the judge. On appeal, Hinson argues that the district court erred in denying his motions to sever and to suppress, Cardwell argues that the evidence was insufficient to sustain his convictions, and both men argue that their sentences violate the Sixth Amendment.

For the following reasons, we hold that the district court did not err in denying Hinson's motions to sever and to suppress, that the evidence was sufficient to sustain Cardwell's convictions, and that the district court, which did not have the benefit of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 750–51, 160 L.Ed.2d 621 (2005), plainly violated the Sixth Amendment in mandatorily enhancing Hinson's and Cardwell's sentence based on judge-found facts. We therefore affirm Hinson's and Cardwell's convictions, and, because the district court's sentencing error seriously affects the fairness, integrity or public reputation of judicial proceedings, we vacate their sentences and remand for resentencing.

### I. Factual Background

In the fall of 1999, federal and state law enforcement agents in the Eastern District of North Carolina began investigating Hinson and Eric Brown on suspicion of drug trafficking. After being contacted by the agents and informed of the investigation, Brown agreed to cooper-ate in the investigation of Hinson. At the agents' direction,

Brown met with Hinson and recorded their conversations on three separate occasions in the fall of 2000. Hinson, however, was guarded in these discussions and did not incriminate himself. Hinson later learned of Brown's cooperation with the authorities.

Thomas Cole was a methamphetamine dealer. He was familiar with both Hinson and Cardwell, having attempted to sell Hinson and Card-well methamphetamine at some time in the past. In the summer of 2001, Cole was arrested in the Western District of Virginia on unrelated drug trafficking charges and found in possession of documents linking him to Hinson. Like Brown, Cole agreed to assist agents in their investigation of Hinson.

Cole contacted Cardwell to arrange a meeting with Hinson, to whom he proposed to give helpful information about the investigation. On October 23, 2001, the three men met in a restaurant in Danville, Virginia. Cole recorded the conversation. Hinson complained of his legal troubles, focusing in particular on Brown. Cole asked if Hinson could "get to" Brown. (J.A. at 367.) Hinson said that Brown needed to be killed, and Cole indicated he would be willing to do it. Hinson asked Cole his price, and Cole said he would do the job for $25,000. Hinson offered him $50,000 and informed Cole he would need to kill Brown's wife as well. The men agreed that Cardwell would give Cole a picture of the Browns and the Browns' address so Cole could carry out the murder.

Over the next few months, Cole and Cardwell spoke several times. In these conversations, the two men had coded conversations from which a reasonable juror could have inferred that Hinson had drugs he was willing to sell Cole. More importantly, they also discussed the Browns. Cardwell assured Cole that Hinson was "serious" about killing the Browns and agreed to be the "middleman" in the deal, (J.A. at 393, 536), because Hinson was nervous about dealing with Cole directly due to the North Carolina investigation against him and what he thought was Cole's ongoing drug trafficking. In his duty as middleman, Cardwell agreed to deliver the money from Hinson to Cole after Cole killed the Browns.

Cardwell, however, never arranged any drug deals between Hinson and Cole, nor did he give Cole the Browns' picture and address. The agents became frustrated with the investigation and instructed Cole to bypass Cardwell and instead attempt to deal directly with Hinson.

On January 29, 2002, Cole and Hinson met at Hinson's home to discuss potential drug deals and the plan to murder the Browns. Hinson instructed Cole to carry out the murders, described the Browns to Cole, provided a way for him to find them, and gave him $1,000 in traveling money. Agents later arranged for a newspaper in the town where the Browns lived to run a false story about the Browns' disappearance. On February 7, 2002, Cole brought the article to Hinson, who, after expressing his satisfaction, burned it to conceal evidence of his link to the (assumed) murders. At that time, Hinson paid Cole $4,000, and agreed to pay some of the balance of the $50,000 by giving him a kilogram of cocaine.

Later that evening, sometime between 11:00 p.m. and midnight, Agents High and Sheetz of the Drug Enforcement Administration in Roanoke, Virginia, (the Agents) executed a search warrant of Hinson's residence. When the Agents arrived at Hinson's residence to arrest him, they knocked and announced their presence several times before Hinson came to the door. When Hinson opened the door, he was immediately arrested and told he was

under arrest for his participation in the murder-for-hire collusion. Once in custody, Hinson was advised of all his rights and he stated that "he understood [them]." (J.A. at 556.) He did not, however, specifically invoke any of his rights. The Agents searched Hinson's house and discovered a loaded gun.

Fifteen to twenty minutes after the arrest, the Agents transported Hinson to Roanoke City Jail, which was approximately two hours away. Hinson was handcuffed with his hands in front of him and placed in the front seat of the Agents' car. An hour-and-a-half or so into the drive, Hinson began talking about farming, and continued to talk for about twenty-to-thirty minutes. As the car approached Roanoke, Agent High asked Hinson why he had not immediately come to the door when they announced their presence. Hinson stated, "if I knew [sic] it was the police, I would have gotten a gun," and "there would have been a gunfight [because I would] rather be killed than go to jail." (J.A. at 560, 622.)

## II. Procedural History

Hinson and Cardwell were charged in the United States District Court for the Western District of Virginia with (1) solicitation to commit murder, 18 U.S.C.A. § 373 (West 2000), (2) attempted murder of a government witness, 18 U.S.C.A. § 1114 (West 2000), (3) witness tampering, 18 U.S.C.A. § 1512(a)(1)(A) (West 2000), (4) retaliating against a government witness, 18 U.S.C.A. § 1513(a)(1)(B) (West 2000), and (5) conspiracy to murder a government witness, 18 U.S.C.A. § 371 (West 2000) (collectively, the murder-for-hire counts). In addition, Hinson was charged with being a felon in possession of a gun, 18 U.S.C.A. § 922(g)(1) (West 2000). Hinson moved to sever the gun count from the murder-for-hire counts. The district court

denied the motion, holding that the counts were related because Hinson's gun possession and involvement in the murder-for-hire cabal were each related to his drug trafficking and that Hinson would suffer no prejudice from the joinder.

At trial, Hinson moved to suppress his statement to Agent High that he would have gotten a gun and started a gunfight if he had known police were at the door. Hinson argued that he had not waived his *Miranda* rights before giving the statement. The district court denied the motion. The jury convicted Hinson on all counts and Cardwell on the solicitation and conspiracy counts. The district court sentenced Hinson to 293 months imprisonment and Cardwell to 131 months imprisonment.

Hinson and Cardwell now appeal. Hinson argues that the district court erred in denying his motions to sever and to suppress, Cardwell argues that the evidence was insufficient to sustain his convictions, and both men argue that their sentences violated the Sixth Amendment. We have jurisdiction under 28 U.S.C.A. § 1291 (West 1993) and 18 U.S.C.A. § 3742 (West 2000), and consider these arguments in turn.

## III. Joinder and Severance (Hinson)

Hinson contends that the district court improperly denied his motion to sever, arguing that (1) the Government improperly joined the gun and murder-for-hire counts in the indictment under Fed. R.Crim.P. 8(a) and, (2) even if joinder was proper, the district court should have severed the gun count from the murder-for-hire counts under Fed.R.Crim.P. 14. The Government argues that (1) the gun and murder counts were properly joined under Rule 8(a) and (2) Hinson was not prejudiced by the district court's failure to sever the counts. Whether offenses in an indict-

ment are improperly joined under Rule 8(a) is a question of law reviewed de novo. *See United States v. Mackins,* 315 F.3d 399, 412 (4th Cir.2003). If the joinder was proper, a district court's order concerning a motion to sever under Rule 14 is reviewed for abuse of discretion. *See id.; United States v. Najjar,* 300 F.3d 466, 473–75 (4th Cir.2002); *United States v. Akinkoye,* 185 F.3d 192, 197–98 (4th Cir. 1999).

### A. Joinder

Rule 8(a) provides that "[t]he indictment ... may charge a defendant in separate counts with [two] or more offenses if [1] the offenses charged ... are of the same or similar character, ... [2] are based on the same act or transaction, or [3] are connected with or constitute parts of a common scheme or plan." We have interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a "logical relationship" to one another. *United States v. Hirschfeld,* 964 F.2d 318, 323 (4th Cir.1992). Such a relationship exists when consideration of discrete counts against the defendant paints an incomplete picture of the defendant's criminal enterprise. *See* 1A Charles Alan Wright, *Federal Practice and Procedure* § 143 (3d ed.1999) (noting that joinder is permitted where "the events pertaining to each [crime are] inextricably tied to the others").

■ Rule 8(a) "permit[s] very broad joinder" because of the efficiency in trying the defendant on related counts in the same trial. *Mackins,* 315 F.3d at 412 (quoting 1A Charles Alan Wright, *Federal Practice and Procedure* § 141 (3d ed.1999)); *see also United States v. Stokes,* 211 F.3d 1039, 1042 (7th Cir.2000) ("[C]ourts ... have a strong interest in favor of joinder of offenses; in particular, joinder of offenses reduces the waste of precious judicial and prosecutorial time in the already overburdened federal judicial system and reduces the burdens on witnesses from testifying at multiple trials."). Rule 8(a) is "not infinitely elastic," however, because unrelated charges create the possibility that a defendant will be convicted based on considerations other than the facts of the charged offense. *Mackins,* 315 F.3d at 412 (internal quotation marks omitted); *see also Bruton v. United States,* 391 U.S. 123, 131 n. 6, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."). When the Government does not proffer evidence tending to show a relationship between the charged crimes at a pre-trial hearing on a motion to sever, as it did not here, we examine compliance with Rule 8(a) by looking to the allegations in the indictment and the evidence produced at trial. *See Mackins,* 315 F.3d at 413; *see also United States v. Chramek,* 331 F.2d 380, 382 (4th Cir.1964) (same under Fed.R.Crim.P. 8(b)).[1]

---

1. Because the Government did not make a pre-trial proffer of evidence, we need not decide whether the district court may consider such proffers in ruling on a motion to sever. *Compare United States v. Dominguez,* 226 F.3d 1235, 1240–42 (11th Cir.2000) (observing that the district court may consider governmental proffers showing propriety of joinder in ruling on a motion to sever); *United States v. Halliman,* 923 F.2d 873, 883 (D.C.Cir.1991) (Thomas, J.) (holding same) *with United States*

*v. Chavis,* 296 F.3d 450, 456–57 (6th Cir. 2002) (collecting cases from the Sixth, Seventh, and Ninth Circuits holding that compliance with Rule 8 is assessed by examining the allegations in the indictment alone); *United States v. Wadena,* 152 F.3d 831, 848 (8th Cir.1998) (holding same); *United States v. Kaufman,* 858 F.2d 994, 1003 (5th Cir.1988) (holding same).

We note that our case law holding that compliance with Rule 8(a) is determined by

■ Hinson argues that his gun possession and participation in the murder-for-hire scheme were separate and distinct from one another and thus had no logical relationship under Rule 8(a). The Government argues that the gun and murder-for-hire counts were logically related because "the firearm count was based on the seizure of the [gun] during the investigation of the murder-for-hire-scheme." Appellee's Br. at 20.

We do not agree with the Government's argument. While discovery of the gun during the murder-for-hire investigation shows a *temporal* relationship between Hinson's gun possession and the murder-for-hire plot—*i.e.,* that they occurred at the same time—we do not believe that a mere temporal relationship is sufficient to show that the two crimes at issue here were *logically* related. *See, e.g., Mackins,* 315 F.3d at 413 (holding joinder of co-incidental counterfeit check and money laundering conspiracies improper where there was no logical relationship between the two); *United States v. Singh,* 261 F.3d 530, 532–33 (5th Cir.2001) (finding joinder of gun charge with charge for harboring aliens improper despite the fact law-enforcement officers discovered the gun while investigating the defendant for harboring aliens). A contrary holding would effectively read Rule 8(a) to allow limitless joinder whenever the charge resulted from the fruits of a single investigation.

In support of its argument, the Government cites, inter alia, *United States v. Stokes,* 211 F.3d 1039, 1042 (7th Cir.2000) and *United States v. Bullock,* 71 F.3d 171 (5th Cir.1995). These cases, however, do not help the Government. In *Stokes,* the Seventh Circuit held that joinder of gun and drug counts was proper where the defendant was arrested in possession of a gun while attempting to purchase drugs. *Id.* at 1042. The court noted that "where firearms have been discovered along with evidence of a defendant's drug trafficking, joinder of firearms and weapons charges has been approved due to the natural inferences that may be drawn from the contemporaneous possession of guns and drugs." *Id.* at 1042. Even assuming *Stokes* is an accurate statement of law with respect to *gun* and *drug* counts, we see no similar inference categorically creating a logical relationship between *gun* and *murder-for-hire* counts when evidence of gun possession is discovered during a murder-for-hire investigation. While our conclusion might well be different if Hinson were the *hired murderer*—because of the natural inference that a murderer will use a gun to accomplish his deed—we see no similar inference linking gun possession to the *one hiring the murderer.* In fact, the more logical inference is that the hirer will not need a gun, because the murderer, not the hirer, will do the killing.

Similarly, in *Bullock,* the Fifth Circuit held that joinder of gun and bank robbery charges was proper where the defendant was apprehended on suspicion of the bank robbery approximately 45 minutes after the robbery and law enforcement officers found a gun in his car. *Id.* at 174. As the Government correctly notes, just as the Agents found Hinson's gun while investigating him for murder-for-hire, law enforcement officers discovered Bullock's gun while investigating him for bank rob-

---

examining the indictment and evidence presented at trial is in tension with the cases from other circuits holding that compliance with Rule 8 is determined by examining the indictment alone. Our rule has the benefit of a built-in type of harmlessness review; if the

indictment does not allege a sufficient relationship for Rule 8(a) purposes, but the evidence at trial reveals that such a relationship exists, it is difficult to see how the defendant could ever be prejudiced by the technical misjoinder.

bery. But the court in *Bullock* did not allow joinder simply because of this fact. Rather, it held joinder was proper because "a factfinder could infer that Bullock had the gun so that it would be available to him during the robbery and escape." *Id.* at 175.

Despite the fact that the Agents' discovery of the gun during their murder-for-hire investigation is not *alone* sufficient to establish a logical relationship between the gun and murder-for-hire counts, we nevertheless believe that joinder of the counts was proper here because *additional facts* demonstrate that the crimes were logically related to one another. When Hinson was apprehended a few hours after giving Cole partial payment for the Browns' murders, the Agents informed him that he was being arrested because of his participation in the murder-for-hire collusion. Hinson's statement to the Agents that he would have started a gunfight had he known they were coming to arrest him shows that he was willing to use the gun to keep him from going to prison because of his participation in the murder-for-hire plan. These facts make Hinson's case like *Bullock*: just as joinder of the gun and robbery counts was proper because "a factfinder could infer that Bullock had the gun so that it would be available to him during the robbery and escape," *id.*, joinder of the gun and murder-for-hire counts was proper here because a factfinder could infer from Hinson's statements that he had the gun so that it would be available to him in the event the authorities came to arrest him on murder-for-hire charges. In other words, Hinson's expressed willingness to use the gun to protect himself from suffer-

ing the repercussions of his participation in the murder-for-hire scheme supplies a logical connection between the two counts. We therefore conclude that the gun and murder-for-hire charges were properly joined as part of the "same transaction" under Rule 8(a).[2]

## B. Severance

Hinson next argues that even if properly joined under Rule 8(a), the district court erred in failing to sever the gun count from the murder-for-hire counts under Rule 14(a) because the jury learned of his status as a felon through the gun charge and was therefore predisposed to convict him on the murder-for-hire counts.

■ Rule 14(a) provides that "[i]f the joinder of offenses ... for trial appears to prejudice a defendant ..., the court may order separate trials of counts...." This rule contemplates that joinder under Rule 8(a) can be proper and, at the same time, severance can be required. Such cases, however, will be rare. It is not enough for the defendant to show that severance offers him "a better chance of acquittal." *United States v. Reavis,* 48 F.3d 763, 767 (4th Cir.1995) (internal quotation marks omitted). Rather, the Supreme Court has admonished that "when defendants properly have been joined under [Rule 8], a district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would ... prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. Similarly, we have stated that reversal under Rule 14 is required only if the defendant shows that

2. The Government argues that the gun and murder-for-hire counts were also properly joined under the "parts of a common scheme or plan" prong of Rule 8(a) because Hinson's gun possession and participation in the murder-for-hire plot were each logically related to

his drug trafficking. Because we conclude that Hinson's gun possession and participation in the murder-for-hire collusion were part of the "same transaction" under Rule 8(a), we need not address this argument.

requiring him to defend against the joined offenses in the same trial resulted in "clear prejudice." *United States v. Acker*, 52 F.3d 509, 514 (4th Cir.1995).

■ We assume, for purposes of this appeal, that evidence of Hinson's prior felony would not have been admissible at a trial on the murder-for-hire counts. Undoubtedly, this fact creates the specter that Hinson was prejudiced by the district court's failure to sever. *Cf. Zafiro*, 506 U.S. at 539, 113 S.Ct. 933 ("[A] risk [of prejudice] might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant."). In this case, however, we do not believe that the potentiality of prejudice materialized into actuality. First, the district court instructed the jury that "[a] separate crime or offense is charged in each count of the indictment. Each charge, and the evidence pertaining to it, should be considered separately." (J.A. at 697.) We have held that a similar charge sufficiently neutralized the possibility that the jury would hold a defendant's felony status against him when considering his guilt on other charges. *Mackins*, 315 F.3d at 415. *See also Zafiro*, 506 U.S. at 539–40, 113 S.Ct. 933 ("When the risk of prejudice [from joint trials] is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."); *Bullock*, 71 F.3d at 175 ("[The defendant] cannot show that he was prejudiced by the failure to sever the counts, as the court admonished the jury that it could consider [his] prior felony conviction only in connection with the firearm count.").

Second, Hinson stipulated to the existence of the prior felony. Keeping the facts *about* the felony (if not the fact *of* the felony) from the jury tends to diffuse any passions that would be aroused by specific evidence of the defendant's felonious past. *See United States v. Moore*, 104 F.3d 377, 382 (D.C.Cir.1997) ("There are several safeguards short of severance that a district court may employ to avoid undue prejudice, including a stipulation as to the existence of the prior felony conviction . . . ." (internal quotation marks omitted)); *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir.1995) (holding that "the risk of prejudice [due to the district court's failure to sever] was mitigated because the prior felony conviction was introduced by stipulation"). Under these circumstances, we conclude that the district court did not abuse its discretion in refusing to sever the counts against Hinson.

## IV. *Miranda* (Hinson)

■ Hinson next argues that the district court erred in admitting into evidence his statement to the Agents about the gun found at his house. We review de novo the district court's legal conclusions on a motion to suppress. *See United States v. Guay*, 108 F.3d 545, 549 (4th Cir.1997). While we review for clear error the district court's factual findings, *id.*, the district court here made no factual findings. It is, of course, the better practice for the district court to make such findings, but where the district court fails to do so, we assume the district court construed the evidence in the light most favorable to the party who prevails on the suppression motion below. *See United States v. Franklin*, 323 F.3d 1298, 1300 (11th Cir.2003); *United States v. Smith*, 543 F.2d 1141, 1145 & n. 11 (5th Cir.1976). On review, we do the same. *Franklin*, 323 F.3d at 1300 (11th Cir.2003).

■ Statements obtained from the defendant during custodial interrogation are presumptively compelled in violation of

the Fifth Amendment's Self–Incrimination Clause and are therefore inadmissible in the Government's case-in-chief. *Miranda v. Arizona,* 384 U.S. 436, 457–58, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Berkemer v. McCarty,* 468 U.S. 420, 429, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (collecting cases). The Government can overcome this presumption of coercion by showing that law enforcement officers (1) adequately informed the defendant of his *Miranda* rights[3] and (2) obtained a waiver of those rights. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The Government does not dispute that Hinson was interrogated while in custody, and Hinson does not dispute that he was adequately informed of his *Miranda* rights. We therefore turn our attention to waiver.

A defendant may waive his *Miranda* rights only if he does so "knowingly and voluntarily." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). Waiver need not be express, but may be implied from the defendant's actions and words. *Id.* To determine whether a defendant has waived his *Miranda* rights, we look to the "totality of the circumstances." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (internal quotation marks omitted). In assessing knowingness, we ask whether the defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In assessing voluntariness, we ask whether the defendant's statement was "the prod-

uct of a free and deliberate choice [or the result of] intimidation, coercion, or deception." *Id.*

Hinson argues that he did not voluntarily waive his *Miranda* rights. We are not persuaded. The Agents informed Hinson of his *Miranda* rights, and Hinson indicated that he understood them. He did not, however, invoke those rights at any time. While law enforcement officers must immediately stop custodial interrogation when the defendant asserts his *Miranda* rights, *see Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), they are free to engage in custodial interrogation when they have given *Miranda* warnings and the defendant does not specifically invoke those rights. *See Davis v. United States,* 512 U.S. 452, 460, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (holding that law-enforcement officers who have given *Miranda* warnings may continue to question a defendant even when his request for counsel is equivocal, a holding that also necessarily applies when the defendant makes no request for counsel at all); *Burket v. Angelone,* 208 F.3d 172, 198 (4th Cir.2000) ("[T]o invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel."). Hinson's failure to invoke his rights therefore left Agent High free to interrogate him. If Hinson had wished to exercise his right to remain silent in response to Agent High's question, nothing prevented him from doing so.[4] Because Hinson had been fully in-

---

3. The defendant must be informed of the following: he has the right to remain silent; anything he says can be used against him; he has the right to an attorney; if he cannot afford an attorney, one will be appointed to him. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Although Hinson's brief is not entirely clear, it can be read to argue that because he was

handcuffed for over two hours in the police car his will was overborne by oppressive custodial conditions. While we do not doubt that oppressive custodial conditions can vitiate the voluntariness of a confession, we also have no doubt that sitting in the front seat of a patrol car with one's hands handcuffed in front of him for two hours does not amount to oppressive custodial conditions.

formed and indicated his under-standing of his *Miranda* rights, his willingness to answer Agent High's question is as clear an indicia of his implied waiver of his right to remain silent as we can imagine. *See United States v. Frankson,* 83 F.3d 79, 82 (4th Cir.1996) ("[A] defendant's ... willingness to answer questions after acknowledging his *Miranda* rights is sufficient to constitute an implied waiver." (internal quotation marks omitted)). We therefore hold that the district court did not err in admitting into evidence Hinson's statement about his access to the gun and his willingness to use it.

### V. Sufficiency of the Evidence (Cardwell)

■■■■ Cardwell argues that the evidence against him was insufficient to sustain his convictions. We must uphold a jury verdict if there is substantial evidence, viewed in the light most favorable to the Government, to support it. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Substantial evidence is that evidence which a "reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos,* 94 F.3d 849, 862 (4th Cir.1996) (en banc).

■■■■ Cardwell was convicted of conspiracy and solicitation to commit murder in violation of §§ 371 and 373, respectively. To establish a conspiracy under § 371, the Government must prove "(1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy." *United States v. Ellis,* 121 F.3d 908, 922 (4th Cir.1997). "The existence of a tacit or mutual understanding between conspirators is sufficient evidence of a conspiratorial agreement." *Id.* (internal quotation marks omitted). Proof of the agreement may be established by circumstantial evidence. *Burgos,* 94 F.3d at 857. It is no defense to a conspiracy charge that one's role in the conspiracy is minor. *See United States v. Laughman,* 618 F.2d 1067, 1076 (4th Cir.1980) ("Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy." (internal quotation marks omitted)).

■■■■ To establish solicitation under § 373, the Government must demonstrate that the defendant (1) had the intent for another to commit a crime of violence and (2) solicited, commanded, induced or otherwise endeavored to persuade such other person to commit the crime of· violence under circumstances that strongly corroborate evidence of that intent. *United States v. Rahman,* 34 F.3d 1331, 1337 (7th Cir.1994). Payment or promises to remunerate the· perpetrator of the underlying crime can be strong corroborative evidence of intent. *See United States v. Gabriel,* 810 F.2d 627, 635 (7th Cir.1987).

■■■■ We conclude that the evidence was sufficient to support Cardwell's convictions. Cole testified that he and Cardwell discussed the plan to murder the Browns numerous times over the few months following the meeting at the Danville restaurant. During these conversations, Cardwell assured Cole that Hinson was serious about killing the Browns. Because Hinson was under intense investigation, Cardwell agreed to be the middleman between Hinson and Cole, and agreed to deliver the payment for the murder. This evidence is sufficient to show that Cardwell participated in the agreement to kill the Browns. *See United States v. Chaverra–Cardona,* 879 F.2d 1551, 1555 (7th Cir. 1989) (concluding that evidence that the

defendant served as a conduit between drug-trafficking ringleader and hitman supported the defendant's conspiracy conviction). In addition, Cardwell's assurances that Hinson was serious and Cardwell's statement that he would serve as the middleman between Hinson and Cole is sufficient to show that Cardwell, at the very least, participated in Hinson's solicitation of Cole.

 Cardwell maintains, however, that his convictions were improper because (1) he personally did not take an overt act in furtherance of the conspiracy and (2) he was so unhelpful that Cole eventually ended up dealing with Hinson himself. These arguments are without merit. First, each co-conspirator need not take an overt act in order to be convicted of conspiracy so long as one conspirator does so. *United States v. Caudle*, 758 F.2d 994, 997–998 (4th Cir.1985) (affirming sufficiency challenge to each defendant's conspiracy conviction where only one defendant participated in an overt act); *Tabor v. United States*, 152 F.2d 254, 258 (4th Cir.1945) (conspiracy requires agreement and overt act committed by "one or more of the conspirators"). Second, Cardwell's unhelpfulness does not amount to a withdrawal from the conspiracy, which requires the defendant to take affirmative actions inconsistent with the object of the conspiracy and communicate his intent to withdraw in a manner likely to reach his accomplices. *See United States v. Walker*, 796 F.2d 43, 49 (4th Cir.1986). Moreover, because the crime of solicitation is complete when the defendant attempts to persuade another to commit a crime, it is of no moment that Cardwell's assurances did not actually persuade Cole to go through with the Browns' murders. *See, e.g., Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1314 (D.C.Cir.2005) ("In criminal law, solicitation is regarded as a freestanding offense: requesting the unlawful act is itself a crime, regardless of whether the request is consummated." (internal quotation marks omitted)). We therefore conclude that the evidence was sufficient to convict Cardwell.

## VI. Sentencing Issues (Hinson and Cardwell)

Hinson and Cardwell each argue that their sentences violate the Sixth Amendment because the district court mandatorily applied judge-found enhancements in the United States Sentencing Guidelines to enhance their sentences above those authorized by the jury verdict alone. *See Booker*, 125 S.Ct. at 750–51 (holding that judge-found sentence enhancements mandatorily imposed under the Guidelines that result in a sentence greater than that authorized by the jury verdict or facts admitted by the defendant violate the Sixth Amendment's guarantee of the right to trial by jury); *United States v. Hughes*, 401 F.3d 540, 547 (4th Cir.2005). Because they did not make this argument to the district court, we review for plain error. *See Hughes*, 401 F.3d at 547.

 Under plain error review, the defendant must show that (1) the district court committed error, (2) the error was plain, and (3) the error affected his substantial rights. *Id.* at 547–55. If the defendant shows that his mandatorily-imposed Guidelines sentence was greater than that authorized by facts admitted by the defendant or the jury verdict alone, he demonstrates a Sixth Amendment error that satisfies these requirements. *Id.* If the defendant makes this three-part showing, correction of the error nevertheless remains within our discretion, which we should not exercise unless "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 555.

We conclude that the district court plainly erred.[5] Hinson's base offense level for the murder-for-hire convictions was 28 and for the gun conviction was 24. The district court applied a four-level enhancement on the murder-for-hire convictions based on its finding that the conspiracy and solicitation offenses involved "the offer or the receipt of anything of pecuniary value for undertaking the murder." U.S. Sentencing Guidelines Manual § 2A1.5 (2004). With the enhancement, Hinson's adjusted offense level on the two sets of counts was 33. *See* U.S.S.G. § 3D1.4. Based on a criminal history category of VI, Hinson's guideline range was 235–293 months. The district court sentenced Hinson to 293 months imprisonment. Without the judge-found enhancement, the combined offense level for the murder-for-hire and gun convictions would have been 30. *See* U.S.S.G. § 3D1.4. Hinson, however, was a career offender, a fact that would have brought his offense level, again without the four-level enhancement, to 32. *See* U.S.S.G. § 4B1.1. With a criminal history category of VI, this offense level would have brought Hinson's sentencing range to 210–262.[6] Hinson's 293–month sentence therefore violated the Sixth Amendment.

Cardwell's base offense level was 28 with a criminal history category of I. This level and category corresponded to a sentencing range of 78–97 months imprisonment. Cardwell, like Hinson, received a four-level enhancement based on judge-found facts under U.S.S.G. § 2A1.5. With this enhancement, his range was 121–151 months imprisonment. The district court sentenced Cardwell to 131 months, and, as with Hinson, thereby committed Sixth Amendment error.

Hinson and Cardwell therefore both satisfy the first three requirements of plain error review. Moreover, we conclude that failing to notice the error—which would result in Hinson and Cardwell serving sentences that were unconstitutional—would "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *United States v. Gray*, 405 F.3d 227, 243 (4th Cir.2005), *cert. denied* —— U.S. ——, 126 S.Ct. 275, 163 L.Ed.2d 245 (2005) (vacating and remanding sentence that violated *Booker* without discussing the magnitude—in terms of additional months—of the district court's sentencing error).[7] We therefore vacate Hinson's and

---

5. As we noted in *United States v. Hughes*, 401 F.3d 540 (4th Cir.2005), "[w]e of course offer no criticism of the district judge, who followed the law and procedure in effect at the time of [Hinson's and Cardwell's] sentencing." *Id.* at 545 n. 4.

6. Although we consider Hinson's career-offender guideline range under U.S.S.G. § 4B1.1 as the baseline for determining whether the district court committed Sixth Amendment error, we do not hold that all sentences under that section are free of Sixth Amendment error. *See United States v. Collins*, 412 F.3d 515, 522–23 (4th Cir.2005) (declining to answer whether the defendant's sentence based on his status as a career offender violated the Sixth Amendment because he conceded the facts giving rise to such designation). Because Hinson did *not* argue

that a sentence imposed under U.S.S.G. § 4B1.1 would have violated the Sixth Amendment, we need not decide the question here.

7. In its opening brief, the Government argued that because the evidence supporting Hinson's and Cardwell's enhancements under U.S.S.G. § 2A1.5 was "overwhelming" and "essentially uncontroverted," we should decline to notice the Sixth Amendment error at sentencing. *Cf. United States v. Cotton*, 535 U.S. 625, 633–34, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (declining to notice plain error when indictment failed to allege facts that increased the defendant's statutory maximum sentence where the evidence of that fact was "overwhelming" and "essentially uncontroverted"); *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137

Cardwell's sentences and remand for re-sentencing. In determining Hinson's and Cardwell's sentences on remand,

> the district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. *Hughes*, 401 F.3d at 546. The court should consider this sentencing range along with the other factors described in 18 U.S.C. § 3553(a), and then impose a sentence. *Id.* If that sentence falls outside the Guidelines range, the court should explain its reasons for the departure, as required by 18 U.S.C. § 3553(c)(2). *Hughes*, 401 F.3d at 546. The sentence must be "within the statutorily prescribed range and ... reasonable." *Id.* at 547.

*Gray*, 405 F.3d at 244 n. 10.

### Conclusion

For the foregoing reasons, we affirm Hinson's and Cardwell's convictions and vacate their sentences and remand for re-sentencing.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART.*

L.Ed.2d 718 (1997)(same result when the defendant was denied the right to a jury trial on one element of his perjury conviction). Despite the strength of this argument, both in the abstract and on the facts of this case, *but see United States v. Oliver*, 397 F.3d 369, 380 n. 3 (6th Cir.2005) (holding that *Cotton*-type analysis does not apply to *Booker* errors because such errors can easily be remedied by resentencing without producing a windfall to the defendant), and despite the fact we have already held that a *Cotton*-type analysis applies to a post-*Booker* Fifth Amendment claim, *see United States v. Harp*, 406 F.3d 242, 247 (4th Cir.2005), *cert. denied* —— U.S. ——, 126

S.Ct. 297, 163 L.Ed.2d 259 (2005) (declining to remand under plain-error review where indictment failed to allege facts used to enhance a defendant's sentence under the Sentencing Guidelines because the evidence in favor of the enhancement was "overwhelming" and "essentially uncontroverted" (quoting *Cotton*, 535 U.S. at 633, 122 S.Ct. 1781)), the Government expressly abandoned this position at oral argument and in supplemental briefing. Accordingly, we will not consider whether Hinson's and Cardwell's sentences should be remanded under *Cotton* and *Johnson*.