**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4806**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JOHN DOUGLAS BIRD, JR.,

        Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Bryson City.  Lacy H. Thornburg, District Judge.  (2:09-cr-00015-LHT-DLH-1)

Argued:  December 10, 2010        Decided:  January 31, 2011

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme Court of the United States, sitting by designation, TRAXLER, Chief Judge, and KEENAN, Circuit Judge.

Affirmed by unpublished opinion.  Judge Keenan wrote the opinion, in which Associate Justice O'Connor and Chief Judge Traxler joined.

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Donald David Gast, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Angela Parrot, Assistant Federal Defender, Fredilyn Sison, Assistant Federal Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North

Carolina, for Appellant. Edward R. Ryan, United States Attorney, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

KEENAN, Circuit Judge:

John Douglas Bird, Jr., was convicted of five offenses relating to the shooting of Merony George Shell on the reservation of the Eastern Band of Cherokee Indians in North Carolina. A jury found Bird guilty of attempted murder, in violation of 18 U.S.C. §§ 1113 and 1153; assault with the intent to commit murder, in violation of 18 §§ U.S.C. 113(a)(1) and 1153; assault with a dangerous weapon, in violation of 18 U.S.C §§ 133(a)(3) and 1153; assault resulting in serious bodily injury, in violation of 18 §§ U.S.C. 113(a)(6) and 1153; and use of a firearm in a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

On appeal, Bird challenges the district court's denial of his motion to suppress statements he made to law enforcement officers after his arrest. Bird also argues that his convictions and sentences for attempted murder and assault with the intent to commit murder constitute multiple punishments for the same offense, in violation of his constitutional protection against being placed in double jeopardy. For the following reasons, we affirm Bird's convictions and sentences.

I.

On December 25, 2008, Shell was walking in the woods when he encountered Bird. According to Shell, Bird was holding a

3

rifle and stated that he was "going to shoot" Shell. Shell responded, "You've got the gun, you might as well kill me." Bird discharged the rifle, shooting Shell in the face and the arm. Shell suffered serious injuries as a result of the shooting.

After Bird was arrested and taken into custody, he was interviewed by William Eugene Owl, an investigator for the Cherokee Indian Police Department (Detective Owl). Before the interview began, Detective Owl advised Bird of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Bird stated that he understood those rights and agreed to talk with Detective Owl.

As the interview began, Bird vomited. Bird informed Detective Owl that his "stomach was messed up," and that he had suffered from this "condition" for "a couple years." Bird also stated that he drank a "couple of beers every morning to make his stomach feel better."

During the interview, Bird denied any involvement with the shooting. When Detective Owl asked Bird if he would be willing to take a polygraph test, Bird responded, "Yes, let's do it, because I didn't have anything to do with [the shooting of Shell]." When Bird asked whether he would be released from custody if he "pass[ed]" the polygraph test, Detective Owl replied, "We [will] have to wait and see."

4

The next day, Detective Owl arrived at the detention center to transport Bird to the office where the polygraph test was to be administered. At that time, Detective Owl observed Bird vomiting. During the one-hour drive to the office, Bird vomited at least two more times.

The polygraph test was administered by Christopher J. Smith (Agent Smith), an assistant special agent with the North Carolina State Bureau of Investigation. Before starting the test, Agent Smith asked Detective Owl and another officer about Bird's physical condition. The officers informed Agent Smith that they thought "some" of Bird's nausea may have been related to alcohol withdrawal, but they also stated that Bird was nervous and previously had vomited when speaking with law enforcement officers.[1]

Agent Smith began his conversation with Bird by advising him of his Miranda rights. Bird indicated that he understood those rights and agreed to waive them. The form that Bird reviewed and signed was entitled, "Polygraph Adult Advice of Rights," and included a statement that he agreed "to answer truthfully all questions asked (a) during the interviews conducted before and after the time I am attached to the

---

[1] The evidence did not establish whether Bird suffered from alcohol withdrawal at the time of his arrest and later interrogation.

polygraph and (b) during the time I am attached to the polygraph."

In preliminary questioning conducted before the polygraph test, Agent Smith asked Bird if he "felt okay" and offered him crackers and water to "settle his stomach." Although the record does not indicate whether Bird accepted Agent Smith's offer, Bird stated that he "felt a little bit better." Agent Smith concluded that although Bird was "a little uncomfortable," he "seemed to be fine." While Agent Smith administered the polygraph test, Bird did not vomit.

At the end of the 90-minute polygraph test, Agent Smith informed Bird that he had failed the test. At that time, Bird admitted that he had shot Shell and provided some general information about the shooting.

Shortly thereafter, Detective Owl conducted a brief interview with Bird but did not repeat the Miranda warnings. Bird admitted to Detective Owl that he shot Shell "[s]omewhere in the mountains." However, Bird maintained that the shooting was a "mistake" and was not intentional.

Before trial, Bird filed a motion to suppress the statements that he made to Agent Smith and Detective Owl. After a hearing, the district court denied the motion, and the case proceeded to a jury trial. During trial, the district court admitted these statements into evidence.

6

The jury found Bird guilty of all five charges. The district court imposed a total sentence of 330 months' imprisonment for the five offenses.

II.

Bird first argues that the district court erred in denying his motion to suppress the statements he made to Agent Smith and Detective Owl. Bird asserts that his waiver of rights was not voluntarily, knowingly, or intelligently made.

In considering a district court's ruling on a motion to suppress, we review the district court's legal conclusions de novo and its factual findings for clear error. United States v. Cardwell, 433 F.3d 378, 388 (4th Cir. 2005). The district court in the present case denied the motion to suppress summarily without making factual findings.

Established principles guide our review of the district court's denial of Bird's suppression motion. A defendant's incriminating statements made during a custodial interrogation will be suppressed unless law enforcement officers advise the defendant of his Miranda rights and the defendant properly waives those rights. See Miranda, 384 U.S. at 444. In the present case, the parties do not dispute that Bird was in custody during the post-polygraph interrogation, or that Bird was advised of his Miranda rights.

7

In determining the validity of a defendant's waiver of Miranda rights, we examine the "totality of the circumstances" of the interrogation, including the defendant's characteristics, the interview environment, and the details of the interrogation. United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002). When reviewing these circumstances, we primarily consider two factors. First, we consider whether the defendant voluntarily relinquished his rights in a free and deliberate manner, without intimidation, coercion, or deception by law enforcement officers. Cardwell, 433 F.3d at 389; Cristobal, 293 F.3d at 140. The critical question under this factor is whether the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct. Cardwell, 433 F.3d at 389; Cristobal, 293 F.3d at 140. Second, we consider whether the defendant waived his rights knowingly and intelligently, fully aware of the nature of the rights being abandoned and the consequences of waiving them. Cardwell, 433 F.3d at 389; Cristobal, 293 F.3d at 140.

Bird argues that he was coerced by Detective Owl to waive his Miranda rights and submit to a polygraph test, because Detective Owl knew that Bird was suffering from alcohol withdrawal and would "do anything" to be released from custody. According to Bird, Detective Owl improperly induced Bird to waive his Miranda rights and take the polygraph test by leaving

8

open the possibility that if he "passed" the test, he might be released from custody.  We disagree with Bird's arguments and conclude that, under the totality of the circumstances, Bird has failed to demonstrate any coercive conduct that would render his waiver of rights involuntary.[2]

The evidence did not show that Detective Owl, or any other law enforcement officer, improperly used Bird's physical condition and possible alcohol dependency to induce him to waive his _Miranda_ rights and take the polygraph test.  Rather, the record demonstrates that Bird agreed to take the polygraph test to show that "[he] didn't have anything to do with [the shooting of Shell]."  After agreeing to waive his _Miranda_ rights and take the polygraph test, Bird asked Detective Owl whether he would be released from custody if he "pass[ed]" the test.  Detective Owl's response, that Bird would "have to wait and see," was inconclusive and did not impair Bird's capacity for self-determination.  Moreover, there is no evidence of coercive conduct by Agent Smith or Detective Owl.  We conclude, therefore, that Bird's will was not overborne, and that his waiver of _Miranda_ rights was voluntary.

---

[2] Bird's argument that his physical condition affected the results of the polygraph test is not relevant to the issue whether his waiver of rights was voluntary.  Therefore, we do not address that argument.

Bird argues, nevertheless, that based on his physical condition at the time he waived his Miranda rights, his waiver was not knowingly or intelligently made. At oral argument in this case, Bird's counsel acknowledged that Bird effectively asks this court to hold, as a matter of law, that a defendant suffering from alcohol withdrawal is unable to make a knowing and intelligent waiver of Miranda rights. We decline Bird's invitation, because the determination whether a defendant has waived his Miranda rights must be based on the totality of the circumstances surrounding the particular interrogation at issue. See Moran v. Burbine, 475 U.S. 412, 421 (1986); Cristobal, 293 F.3d at 140. A uniform rule that a defendant exhibiting symptoms of alcohol withdrawal cannot knowingly waive his Miranda rights would violate this required individual assessment.

In the present case, although Bird had vomited several times before agreeing to waive his Miranda rights and sign the waiver form, there is no evidence indicating that his nausea impaired his mental capacity to understand his rights or the effect of his waiver. Bird's statement to Detective Owl that Bird expected that the polygraph test results would exonerate him is evidence that he made a knowing choice to participate in the test. Additionally, when Agent Smith questioned Bird about his physical condition, Bird told Agent Smith that he "felt

10

better."  Based on these statements by Bird and the lack of any evidence that Bird's nausea impaired his mental faculties, we conclude that Bird knowingly and intelligently waived his Miranda rights.  Accordingly, we hold that the totality of the circumstances supports Bird's waiver under Miranda, and that the district court did not err in denying Bird's suppression motion.[3]

III.

Bird next argues that his convictions and sentences for attempted murder and for assault with the intent to commit murder constitute multiple punishments for the same offense, in violation of his constitutional protection against being placed in double jeopardy.  Because Bird did not assert this defense in the district court, we review his argument on appeal for plain error.  United States v. Olano, 507 U.S. 725, 731–32, 736 (1993).  To establish plain error, Bird must demonstrate that (1) the district court erred; (2) the error was plain; (3) the error affected Birds' substantial rights; and (4) the error, if

_____

[3] We find no merit in Bird's argument that Agent Smith and Detective Owl were required to provide additional Miranda warnings after the polygraph test ended.  The waiver form reviewed and signed by Bird before the polygraph test began contained clear language that that the waiver applied to both "interviews conducted before and after the time [Bird was] attached to the polygraph," and during the polygraph examination.

11

not corrected, would seriously affect the fairness, integrity, or public reputation of judicial proceedings. Id.

Under the Double Jeopardy Clause of the Fifth Amendment, a person may not be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This provision protects a defendant from a second prosecution for the same offense after acquittal, a second prosecution for the same offense after a conviction, and multiple punishments imposed in a single prosecution for the same offense. Jones v. Thomas, 491 U.S. 376, 381 (1989); United States v. Martin, 523 F.3d 281, 290 (4th Cir. 2008).

When examining the issue of multiple punishments for the same offense in a single prosecution, the double jeopardy violation alleged here, we consider the punishment that the legislature intended for the crimes. See Jones, 491 U.S. at 381; Missouri v. Hunter, 459 U.S. 359, 366 (1983). If a defendant's single course of conduct violates more than one statute, a court generally may impose multiple punishments if the legislature authorized those punishments. Hunter, 459 U.S. at 365; United States v. Ayala, 601 F.3d 256, 265 (4th Cir. 2010). However, it is presumed that the legislature did not intend to authorize multiple punishments under two statutory provisions if those provisions proscribe the "same offense."

12

Hunter, 459 U.S. at 366 (citing Whalen v. United States, 445 U.S. 684, 691-92 (1980)).

In determining whether two provisions proscribe the same offense, we apply the test set forth in Blockburger v. United States, 284 U.S. 299 (1932). Ayala, 601 F.3d at 265. In Blockburger, the Supreme Court stated that when the "same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. at 304.

In applying this test, we consider exclusively the legal elements of the different offenses, not the particular facts of the case at issue. See Blockburger, 284 U.S. at 304; Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975); Whalen, 445 U.S. at 694 n.8; see also Ayala, 601 F.3d at 265; United States v. Allen, 13 F.3d 105, 109 n.4 (4th Cir. 1993). If the offenses, viewed comparatively, each require proof of at least one different element, then the offenses are not the "same" and multiple punishments are presumptively valid absent a clear showing of contrary Congressional intent. Ayala, 601 F.3d at 265 (quoting United States v. Terry, 86 F.3d 353, 356 (4th Cir. 1996)). However, two different statutes are considered as defining the "same offense" when one offense is a lesser included offense of the other. Rutledge v. United States, 517

13

U.S. 292, 297 (1996); see, e.g., Ball v. United States, 470 U.S. 856, 861-864 (1985) (concluding that multiple prosecutions were barred because statutes directed at "receipt" and "possession" of a firearm amounted to the "same offense" because proof of receipt "necessarily" included proof of possession); Whalen, 445 U.S. at 691-695 (concluding that two punishments could not be imposed because rape and felony murder predicated on the rape were the "same offense"); Brown v. Ohio, 432 U.S. 161, 167-168 (1977) (confirming conclusion that offense of "joyriding" was a lesser included offense of auto theft).

In the context of these principles, we consider the elements of the charged offenses at issue here, assault with the intent to commit murder, punishable under 18 U.S.C. § 113(a), and attempted murder, punishable under 18 U.S.C. § 1113. The elements of assault with the intent to commit murder are: 1) assault; and 2) the specific intent to commit murder. See United States v. Perez, 43 F.3d 1131, 1137 (7th Cir. 1994).

We observe that the crime of "assault" is not defined under federal statutory law, and that this circuit has not addressed the required elements of a criminal assault. We have recognized, however, that other courts uniformly have held that federal statutes criminalizing particular types of assaults incorporate the common law definition of "assault." See United States v. Passaro, 577 F.3d 207, 217-18 (4th Cir. 2009). At

14

common law, an assault is committed when a person willfully attempts to inflict injury on another, or threatens to inflict injury on another, coupled with an apparent present ability to do so, causing a reasonable apprehension of immediate bodily harm. United States v. Dupree, 544 F.2d 1050, 1051 (9th Cir. 1976); United States v. Bell, 505 F.2d 539, 540 (7th Cir. 1974). In the present case, the jury instructions defining "assault" apply this common law definition.

Attempted murder, like any attempt to commit a crime, is a separate offense from the crime intended by the attempt. See United States v. Pratt, 351 F.3d 131, 135 (4th Cir. 2003). Although there is no federal statutory definition of "attempt," we have explained that the elements of an "attempt" are:

> (1) the defendant had the requisite intent to commit a crime; (2) the defendant undertook a direct act in a course of conduct planned to culminate in his commission of the crime; (3) the act was substantial, in that it was strongly corroborative of the defendant's criminal purpose; and (4) the act fell short of the commission of the intended crime due to intervening circumstances.

Id.

The Supreme Court has explained that under the common law, the conduct required to prove an "attempt" includes an "overt act" constituting a "substantial step" toward completion of the intended offense. United States v. Resendiz-Ponce, 549 U.S. 102, 106 (2007); see Braxton v. United States, 500 U.S. 344, 349

15

(1991). The jury instructions in the present case stated, among other things, that proof of a "substantial step" toward the commission of murder was required to convict Bird of attempted murder. A separate instruction defined the term "substantial step" as a "firm, clear, and undeniable action to accomplish" murder.

The issue whether a defendant has engaged in a "substantial step" is a question requiring review of the factual circumstances of a particular case. United States v. Neal, 78 F.3d 901, 906 (4th Cir. 1996). We have explained that the presence of certain facts provide strong corroboration of a defendant's criminal intent and may constitute a substantial step toward commission of a substantive crime. Such facts include: (1) lying in wait, searching for, or following the contemplated victim; (2) reconnoitering the place contemplated for the commission of the crime; (3) possession of materials to be employed in the commission of a crime; and (4) possession or fabrication of materials to be used in committing the crime at or near the place chosen for its commission. Pratt, 351 F.3d at 135.

Here, Bird acknowledges that an initial comparison of the elements of the two crimes at issue reveals that each contains an element that the other does not. Attempted murder requires proof of a "substantial step" toward the commission of murder,

16

while assault with the intent to commit murder requires proof of an "assault." Bird argues, however, that one who commits an assault coupled with the specific intent to commit murder necessarily takes a "substantial step" toward the commission of murder. Thus, Bird contends that attempted murder is a lesser-included offense of assault with intent to commit murder, and that multiple convictions and sentences for these "same offenses" violate double jeopardy principles.

Bird cites no authority in support of this argument, and we observe that no federal appellate court has addressed this issue in a published opinion. To satisfy the plain error standard of review, however, Bird must show that the error committed by the district court was plain under established law. See Olano, 507 U.S. at 734.

In United States v. Beasley, 495 F.3d 142, 149 (4th Cir. 2007), we explained the limited nature of plain error review. There, we examined the timeliness of an information filed under 21 U.S.C. § 851(a) for purposes of seeking enhanced punishment for a repeat drug offender. Id. at 145. We held that in the absence of controlling Supreme Court or circuit precedent, we could not say that the district court committed plain error in holding that the information, which was filed after the jury was selected but before it was sworn, was timely filed "before trial" as required by the statute. Id. at 149.

17

We emphasized in <u>Beasley</u> that to qualify as plain error, the error must be plain under "current law." <u>Id.</u> at 149 (<u>citing Olano</u>, 507 U.S. at 734). We further explained that for purposes of plain error review, it is sufficient that an error be plain at the time of appellate consideration. <u>Id.</u> at 149-150 (<u>citing Johnson v. United States</u>, 520 U.S. 461, 468 (1997)).

In the case before us, there was no controlling Supreme Court or circuit precedent on this double jeopardy issue when Bird was sentenced by the district court, and there is no controlling precedent on that issue today. Therefore, we cannot conclude that the district court plainly erred under established law in imposing convictions and sentences for both attempted murder and assault with the intent to commit murder. <u>See Johnson</u>, 520 U.S. at 468; <u>Olano</u>, 507 U.S. at 732; <u>Beasley</u>, 495 F.3d at 149-150. Accordingly, for the reasons stated, we affirm the district court's judgment.

<u>AFFIRMED</u>

18