**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-4596**

───────────

UNITED STATES OF AMERICA,

            Plaintiff – Appellee,

v.

DERICKSON LAWRENCE,

            Defendant – Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. Gibney, Jr., Senior District Judge.  (2:23-cr-00089-JAG-LRL-1)

───────────

Argued:  December 12, 2025                          Decided:  April 14, 2026

───────────

Before WILKINSON, RICHARDSON, and QUATTLEBAUM, Circuit Judges

───────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Wilkinson and Judge Quattlebaum joined.

───────────

**ARGUED:**  Patrick L. Bryant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Anthony Comer Mozzi, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  Geremy C. Kamens, Federal Public Defender, Keith Loren Kimball, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant. Erik S. Siebert, United States Attorney, Daniel J. Honold, Assistant United States Attorney, Alexandria, Virginia, E. Rebecca Gantt, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Derickson Lawrence defrauded a business and its employees. He also defrauded the federal government. Following a five-day trial, a jury convicted him of eleven counts of wire and mail fraud. He appeals his convictions, contending that the evidence was insufficient to establish fraudulent intent and that the district court should have tried his two fraud schemes separately. He also challenges a sentencing enhancement. As his arguments lack merit, we affirm.[1]

## I.      Background

Derickson Lawrence owned and operated a small business called MarketView, Inc. In 2004, MarketView started providing paycard services to BOTH, Inc., which owned several Golden Corral restaurant locations in the mid-Atlantic region. Using MarketView's services, Golden Corral employees could choose to receive their wages in the form of a debit-card-like paycard instead of a paper paycheck, and many employees opted for the paycard option.

Accordingly, these Golden Corral restaurants sent payroll funds to MarketView, and MarketView issued paycards to the restaurant employees. Employees could use these paycards to make purchases or withdraw their money. Because the cardholders did not usually use or withdraw their entire pay at once, MarketView sat on a pot of cash. In

---

[1] Lawrence, with leave of this Court, submitted a pro se supplemental brief and moved to exceed the page limitations. Dkt. Nos. 13, 54, 63, 66. We grant the motion but find no merit in the claims raised in the pro se supplemental brief. Though captioned as a brief, it is in substance a motion for release pending appeal, which counsel later filed as a motion, and we denied. Dkt. Nos. 63, 84, 89. To the extent it raises sentencing challenges not addressed in counsel's brief, we find they are without merit.

2

marketing materials and cardholder agreements, Lawrence represented that the paycard would be "everything a bank is" and reserved only a limited authority to invest the funds in safe, liquid vehicles. J.A. 1386.

But by 2017, Lawrence began moving cardholder payroll funds to his personal brokerage account, routing the transactions through an intermediary account. Lawrence then traded options with the funds—and never told the cardholders or Golden Corral about it. For the next two years, Lawrence traded options almost daily. When he lost money, as he often did, Lawrence transferred more cardholder funds to his brokerage account. From April 2017 to October 2019, he transferred over $200,000 of cardholder funds to his brokerage account. And on the few occasions when he made money trading options, Lawrence kept the money for himself. In that entire period, Lawrence returned money from his personal brokerage account to the cardholder account only once: a paltry sum of less than $10,000.

By late 2018, as a result of Lawrence's conduct, cardholders' accounts did not have the money that they had sent to MarketView, so they could not access their funds. After they complained to Golden Corral, it demanded more documentation from Lawrence. Lawrence admitted that MarketView had run out of money, but he grossly understated the extent of the shortfall.

Beyond flat-out lying, Lawrence hid the extent of his fraud in other ways too. He began charging inactivity fees retroactively. He also restricted Golden Corral's access to balance information under the guise of privacy law compliance. Finally, in December

2019, Golden Corral terminated its relationship with Lawrence and reported MarketView to the federal government.

By then, MarketView was finished:  It had lost its only client and all its employees except Lawrence.  But this did not stop Lawrence from applying for a Paycheck Protection Program (PPP) loan from the Small Business Administration in early 2020.  To do so, he submitted manipulated bank records that falsely represented that MarketView was still operating and paying its employees in February 2020.  Once Lawrence received the loan, those funds also made their way to his personal brokerage account.

In 2023, Lawrence was indicted on nine counts of wire fraud and one count of mail fraud arising from his paycard scheme, and one count of wire fraud arising from his PPP loan scheme.  Before trial, Lawrence moved to sever the PPP-fraud count, arguing the joinder was either improper or so prejudicial as to require severance.  The district court denied the motion, concluding that the counts were properly joined and that any prejudice could be cured.  After a five-day trial, the jury convicted Lawrence of all eleven counts.  At sentencing, the district court applied an enhancement for Lawrence's use of "sophisticated means" to carry out the fraud and sentenced him to 87 months in prison.

Lawrence timely appealed.  He argues that (1) there was insufficient evidence of his intent to commit fraud, (2) the district court erred in applying the sophisticated-means enhancement to his sentence, and (3) the district court erred in denying his motion to sever the PPP-fraud count.

4

We find the evidence amply established his intent to defraud.[2]  It also supported the sophisticated-means sentencing enhancement.[3]      The joinder issues require more explanation, but those arguments ultimately fail too.

## II.      Misjoinder And Severance

"Whether charges are properly joined in an indictment is a question of law that we review *de novo*."  *United States v. Hawkins*, 776 F.3d 200, 206 (4th Cir. 2015); Fed. R. Crim. P. 8(a).  When charges are properly joined, we ask only if the district court abused its discretion in denying a motion to sever.  *United States v. Mackins*, 315 F.3d 399, 412 (4th Cir. 2003); Fed. R. Crim. P. 14(a).

---

[2] Lawrence claims that he lacked the specific intent to defraud because he never "intended for the cardholders to lose their money," Opening Br. at 17, and later made efforts to "right the ship," Reply Br. at 4.  But he did not need to intend to "leave the victim[s] economically worse off" in order to intend to defraud them.  *Kousisis v. United States*, 605 U.S. 114, 124 (2025).  It is sufficient that he lied to "obtain . . . money or property."  *Id.* (internal quotation marks omitted); *United States v. Godwin*, 272 F.3d 659, 666–67 (4th Cir. 2001).  And there was evidence from which a jury could have reasonably concluded that here. Lawrence falsely represented that the paycard service was "everything a bank is." J.A. 1386.  And he promised to invest the balance only "in an overnight money market account secured by US Treasury obligations and other similar short term, liquid investments," *even after* he started using the payroll funds to trade options.  J.A. 1392.  Further, his purported efforts to "right the ship"—moving money around, understating shortfalls, charging new fees, and restricting Golden Corral's access to balance information—could just as easily be characterized as efforts to cover his tracks, supporting rather than undermining a finding of intent to defraud. *See United States v. Perry*, 757 F.3d 166, 176 (4th Cir. 2014).

[3] The Sentencing Guidelines "direct[] the sentencing court to increase the offense level by two levels if 'the offense otherwise involved sophisticated means.'" *United States v. Wolf*, 860 F.3d 175, 199 (4th Cir. 2017) (quoting U.S.S.G. § 2B1.1(b)(10)(C)).  For years, Lawrence used multiple accounts to conceal his transactions, charged inactivity fees retroactively to hide the extent of the shortfall, and hid account balances from his client under the guise of legal requirements.  Accordingly, the district court did not clearly err in finding that Lawrence used sophisticated means to commit fraud.

Federal Rule of Criminal Procedure 8(a) permits broad, but not limitless, joinder. Multiple offenses may be joined if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Rule 8(a) thus allows "very broad joinder" to avoid duplicate witnesses and juries. *Hawkins*, 776 F.3d at 206 (quoting *Mackins*, 315 F.3d at 412); *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008). Still, the requirements "are not infinitely elastic." *Hawkins*, 776 F.3d at 206 (quoting *Mackins*, 315 F.3d at 412). Something more than the identity of the defendant and a temporal relationship must tie the offenses together. *Id.* at 209. No checklist resolves this fact-specific inquiry. But we have found that "a logical and intimate connection" exists between offenses when one offense sets up the other or helps carry it out. *Id.* at 207 (citing *United States v. Cole*, 857 F.2d 971, 973 (4th Cir. 1988) (finding joinder of drug-distribution and alien-smuggling charges proper when the smuggled aliens later supported the drug-distribution scheme)). And joining multiple violations of the same statute is "unremarkable," even when time has passed between the offenses. *Id.* at 208 (citing *United States v. Rousseau*, 257 F.3d 925, 932 (9th Cir. 2001) (finding two felon-in-possession offenses properly joined though they occurred more than six months apart and involved different firearms)).

Lawrence claims the schemes were not of a similar character because they differed in nature, scope, and time.[4] To be sure, the schemes themselves were distinct. But they

---

[4] Lawrence argues that the PPP fraud was "about money improperly coming in" while the paycard fraud was "about money improperly going out." Opening Br. at 27. But this is not true. The paycard fraud was also "about money improperly coming in." Lawrence's continued misrepresentations of safe investment were meant not only to

overlapped in material ways:  Both involved MarketView as a vehicle for misappropriating funds, and both employed the same methods to hide how Lawrence used those funds. These similarities meant some witnesses and proof overlapped.  And his paycard fraud precipitated his PPP fraud:  When the paycard scheme collapsed, Lawrence needed cash, so he turned to PPP.  Finally, both frauds were indicted under the wire fraud statute, 18 U.S.C. § 1343.  So we agree with the district court that the two frauds were sufficiently connected to make the initial joinder proper.

The district court also acted within its discretion in declining to sever the properly joined offenses.  When joinder is proper, the court may nevertheless sever the trials when joinder "appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a). However, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993).  A "district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005).  Even when "the risk of prejudice is high," the district court may rely on "less drastic measures" than requiring separate trials, "such as limiting instructions," to sufficiently cure any risk of prejudice. *Zafiro*, 506 U.S. at 539.

---

disguise his improper transfer of funds to his own account (going out) but also to induce additional funds from Golden Corral and its employees (coming in).  And regardless, both schemes revolved around Lawrence's lies about how he would use the funds entrusted to him.

7

Mindful of the deference owed to the district court, we find that Lawrence's two claims of prejudice do not require severance. First, Lawrence argues that the evidence of multiple fraud schemes "invite[d] the jury to convict [him] based on an inference that he has a fraudulent character generally." Opening Br. at 31. Second, he argues that the joinder prejudiced him because he was "forced" to "essentially concede" guilt on the PPP-fraud count and would face "risks" by "testify[ing] about one matter but remain[ing] silent about another." *Id.*

Lawrence's first argument is that joinder posed a risk of the jury drawing a propensity inference. That is, once he effectively conceded that the evidence supported finding him guilty of PPP fraud, the jury might conclude that he likely defrauded Golden Corral and its employees too. But two countervailing factors minimized the risk of propensity prejudice in this case. First, the government presented "substantial, direct evidence of guilt." *United States v. Jamar*, 561 F.2d 1103, 1107 (4th Cir. 1977). Second, the district court gave an appropriate curative instruction to the jury: "A separate crime is charged in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately." J.A. 998. A generalized propensity fear is the very concern limiting instructions are designed to address. Whatever propensity prejudice existed, this instruction "sufficiently neutralized the possibility that the jury would hold" Lawrence's other crimes "against him when considering his guilt on other charges." *Cardwell*, 433 F.3d at 388.

Lawrence's second argument is that joinder impaired his defense. He wanted to testify about the paycard scheme, but not the PPP-fraud count, and feared the adverse

8

inference that choice might invite. Even though "[p]rejudice may develop when an accused wishes to testify on one [count] but not the other," severance is not required merely because he alleges that he wishes to offer limited testimony. *Baker v. United States*, 401 F.2d 958, 976 (D.C. Cir. 1968); *Jamar*, 561 F.2d at 1108 n.9. Rather, the defendant must make a convincing and particularized showing that he has (1) "important testimony to give concerning one count," and (2) "a strong need to refrain from testifying on the other." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984) (quoting *Baker*, 401 F.2d at 976–77); *United States v. Clark*, 928 F.2d 639, 645 (4th Cir. 1991). He must make this showing[5] with enough specificity for the court to "make an independent evaluation of whether the defendant will be prejudiced to an extent that outweighs the interests favoring joinder," such as judicial economy. *Jamar*, 561 F.2d at 1108 n.9. And he must provide "enough information . . . to satisfy the court that the claim of prejudice is genuine." *Goldman*, 750 F.2d at 1225 (quoting *Baker*, 401 F.2d at 977).

Here, Lawrence did not provide any information about the testimony he wished to present and thus failed to demonstrate that his choice not to testify created "[the] strong showing of prejudice" that could demand separate trials. *Goldman*, 750 F.2d at 1225. Lawrence also failed to particularly demonstrate a strong need to refrain from testifying on the PPP-fraud count. Lawrence expressed both a desire to "remain silent as to [the PPP-fraud count], allowing his lawyer to construct a defense through the extensive documentary

---

[5] Note that even this showing does not transform Rule 14's "may" into a "must." Even if a district court finds that joinder prejudices the defendant, it may nonetheless conclude that other interests favoring joinder outweigh such prejudice.

9

record," J.A. 39, and a concern that the jury might draw an adverse inference from his decision to only testify about the paycard scheme. But this generic, broadly stated concern does not constitute a strong reason to stay silent. In order to make "a strong showing of prejudice," a defendant must raise something more than run-of-the-mill concerns that might arise in any case involving joinder.

For example, Lawrence's general concern about jurors drawing an adverse inference from selective testimony would arise whenever a defendant prefers to testify to some counts and not others. Perhaps a juror could assume a defendant's silence about certain crimes amounts to an admission of guilt. But courts routinely address such improper inferences through jury instructions. Indeed, "to require a severance based on such . . . unembellished assertion[s]" as a general concern about inferences of guilt from silence "would effectively strip the trial court of its discretion in the matter of joinder, vesting it instead in the defendant." *Jamar*, 561 F.2d at 1108 n.9.[6]

Here, Lawrence failed to make a strong, particularized showing about the testimony he would have given about the paycard scheme and his reasons for remaining silent on the PPP-fraud count. The district court therefore acted within its discretionary authority in denying his severance motion. *See Zafiro*, 506 U.S. at 538–39.

*        *        *

---

[6] Lawrence's purported desire to allow his lawyer to construct a defense using documentary evidence also fails to provide a strong reason for his decision to remain silent. The notion that one's lawyer could make out a good case without using one's testimony does not provide an explanation as to why one's testimony, if given, would be prejudicial. Just like his concerns about adverse inferences, this assertion is run-of-the-mill and general.

10

Sufficient evidence supported Lawrence's convictions and the sophisticated-means enhancement. And once the district court properly joined the schemes, it acted within its discretion in denying severance. The judgment is accordingly

*AFFIRMED.*